326

John **REDDICK**, Libelant,

v.

**McALLISTER LIGHTERAGE LINE, Inc.,**
Respondent,

**JOHN P. CLARK, & SON, Inc.,** and New
York & Cuba Mail Steamship Co.,
Inc., Respondents-Impleaded.

United States District Court
S. D. New York.

Aug. 26, 1957.

New York, with the following freight, from off the steamship, Parthia:

| | | |
|---|---:|---|
| 15 unpacked Land Rovers (automobiles) | 41,625 | pounds |
| 1 C/S Land Rover Metal Tops | 1,165 | " |
| 1 C/S Diesel Engine | 4,592 | " |
| 1 New (unpacked) 3-½ Litre. Jacquar (automobile) | 3,053 | " |
| 2 C/S Textile Machinery | 11,892 | " |
| 20 C/S Land Rovers (automobiles) | 89,600 | " |

The above mentioned cases or crates were of a "knock-down" type, made of pine wood. There is no proof as to their actual construction.

Thomas Puleo, an employee of Cuba Mail, was at Pier 92, and checked the cargo as it was put on the Tyler. He was not called as a witness. However, a checker at Pier 36 noted that some of the unboxed vehicles were scratched and dented, but observed no injury to any of the wooden cases.

Larsen made no inspection as to the condition of the freight, or its containers. His only concern was to see that the cargo, when put aboard the lighter, "would not fall overboard", or make it impossible for him to have access to the rails of the Tyler.

Upon completion of the loading operations at 6 o'clock p. m., Larsen left the lighter at Pier 92 and went home.

Under an oral agreement between Cuba Mail and McAllister, the latter was to transport the freight from Pier 92 to Pier 36, where it was to be discharged by stevedores of Cuba Mail, and forwarded to destinations in Cuba and Mexico.

During the night of February 13, the lighter was towed to Pier 36, and, upon navigable waters, was moored on its northerly side, bow-in, towards the Manhattan shore. Larsen boarded her there on the morning of February 14th. Nothing of incidence seems to have transpired on that day, and at 5 o'clock p. m., Larsen again went home. He is without knowledge at to what, if anything, happened to the cargo, during his absences.

At 8 o'clock a. m., on February 15, Larsen was again on board the Tyler,

Morris Hirschhorn, New York City, for libelant.

Purdy, Lamb & Catoggio, New York City, Vincent A. Catoggio, New York City, of counsel, for respondent.

Hampton & Dietel, New York City, Walter Hampton, New York City, of counsel, for respondent-impleaded, John P. Clark & Son, Inc.

Cohen, McGuirk & Michels, New York City, John J. Cullen, New York City, of counsel, for respondent-impleaded, New York & Cuba Mail S.S. Co., Inc.

KNOX, District Judge.

Libelant, about 61 years old, is an unschooled, dull-minded Negro. He lacks ability to give a clear circumstantial account of the accident, underlying this suit. His testimony, in connection therewith, is confused and difficult to reconcile. For thirty years, he has been employed as a stevedore by New York and Cuba Mail Steamship Company.

John T. Clark & Son, Inc., a stevedoring concern, performs such work in and about the harbor of New York.

At the time here involved, McAllister Lighterage Line, Inc., owned and operated the lighter, Tyler, in charge of Lars Larsen. He had been her captain for six years, and has worked on lighters, on and off, for forty years.

Amidship on the Tyler, there is a hoist, or "stick", whereby Larsen, through the aid of other mechanical appliances, could lift cargo from the deck of the lighter, and swing it to piers alongside which she moored.

Hereinafter, the aforesaid corporations will be designated as Cuba Mail, Clark, and McAllister.

On February 13, 1956, Clark, pursuant to an oral contract with McAllister, loaded the Tyler, at Pier 92, North River,

and a gang of six stevedores, including libelant, employed by Cuba Mail, went on her deck to discharge the cargo. Joe Caccio, now deceased, was its foreman. During unloading procedure, a light rain fell, .04 of an inch.

In a housing, about amidship of the lighter, Larsen stationed himself to handle the levers of the cargo hoist.

According to libelant, the cases of freight were stowed closely against each other. On their bottoms, and near their respective ends, there was a groove, or cut out. Thus, the metal cables of cargo slings could be slipped beneath the cases without difficulty. But, due to the manner in which the boxed freight had been stowed, there were insufficient spaces between the cases to enable them to be encircled by the lines of the cargo slings, and thus be lifted from the lighter, and swung to the pier.

In order that this might be accomplished, Caccio directed libelant to get on top of the cases, and pry them apart from each other, with a crowbar. As respects seven or eight of the containers, libelant did this successfully. In each such instance, when the slings were properly adjusted, he signaled Larsen, and the case was lifted from the Tyler, and landed on the pier.

Finally, Reddick came to two cases stowed athwart the forward portion of the lighter's deck. Each of them was about 14 feet in length, and 5 feet high, one piled on top of the other. This gave them a total height of 10 feet above the deck of the Tyler, and the tide being high, about 15 feet above the floor level of the pier.

A similar tier of cases seems to have been stored forward of, and closely against, those of the first tier. There is no certainty as to whether libelant, in performing his work, was on top of the upper case of the first, or the second, tier. In either event, his purpose was to pry apart the two upper cases, get the sling lines around the upper case of the first tier, and thus enable it to be swung to the pier.

In making this effort, libelant lost his footing, and plunged to the floor of the dock, fracturing the internal malleolous of his right ankle, and right shin bone.

On April 19, 1956, libelant filed a libel in personam against McAllister, seeking recovery of damages arising from his injuries.

The gravamen of the libel is that such injuries were due solely to McAllister's negligence * * * ; its failure to take any means or precautions for his safety, and was otherwise careless and negligent, and that, by reason thereof, the Tyler was unseaworthy.

McAllister, in addition to pleading a general denial of libelant's allegations, avers that libelant's injuries were caused by faults of persons for which it is not liable, and that Reddick's own negligence accounted for his accident, or contributed thereto. The answer sets forth other alleged defenses, unnecessary to mention.

McAllister, subsequent to filing its answer, impleaded Clark and Cuba Mail, charging each of them with responsibility for libelant's mishap, and asking that they indemnify it for any damages assessed against the owner of the Tyler.

Each impleaded respondent denies the allegations made against it by McAllister.

Upon the trial, and during the examination of Larsen, he was asked, and answered, the following questions:

"Q. Captain, some of these cases were very heavy? A. Yes.

"Q. What is your practice in loading these heavy cases on board your lighter? Do you put * * * dunnage between them so that you can get a sling around them and remove them? A. Most of the cases have dunnage on it. They have heavy scantlings underneath the case, for the heavy ones * * * so you can get slings underneath.

"Q. Were the cases stowed on your deck close together? A. Well,

some were close, and some were far apart.

"Q. Did you use any scantlings in loading this cargo? A. I don't recollect that, because that is a thing I have nothing to do with. That is up to the stevedore, if he wants to put scantlings, some do, and some don't.

\* \* \* \* \* \*

"Q. Did anybody put scantlings between these cases when they were loaded on your barge? A. Well, most of the time they do, but I could not recollect if they did it on some of these cases."

In addition to the foregoing, the witness was asked, and answered, these questions:

"Q. Now, in your experience, isn't it customary to leave spaces between cases of cargo? A. Yes.

"Q. And do you know whether spaces were left between all the cases on this vessel on February 13, 1956? A. Sometimes, he—(the stevedore) places one case, and then he comes in with the next one, and he might shove that one up against the case, or hard against the other case, and he would leave it that way, and he would not move it out.

\* \* \* \* \* \*

"Q. Did you make any objections when they loaded these cases right flush against each other? A. I make objections sometimes, but they would not listen to me. They would leave them there. They haven't time to move them out. If I said anything, they would not take anything else."

Thereafter, this colloquy took place between counsel for libelant, and Larsen:

"Q. In a general way, how are the cases most generally stowed, knock-down cases?

"Mr. Catoggio (representing McAllister): Which side?

"Mr. Hirschhorn (for libelant): Either side, from bottom to bottom.

First, from side to side, are there spaces generally?

"The Witness: Yes, they always have a little space in between.

"Q. Always leave a little space in between? A. Yes.

\* \* \* \* \* \*

"Q. What is the correct way of loading, with the space, or without a space? A. With the space.

"Q. With the space? A. Yes."

Reverting, now, to libelant's version of his accident, he described it, as below set forth:

"Well, I put the wire on the end laying out from the dock—I start to walk to the other end to get ready to put the wire on that end. I had the crowbar in my (right) hand. \* \* \* I hit some nails with my foot, and I made a false step and I fell \* \* \*. When I fell in this case, my leg, my right leg, went down, and it threw me over sideways, on top of the dock. \* \* \*"

Counsel for libelant then inquired:

"Q. Did anything else happen aside from the nails hitting your foot? A. This hole.

"Q. Which hole? A. On the *other* case, my foot went down.

"Q. Where was this hole located? A. It was located about that far from here (indicating two feet).

"The Court: Could you see this hole?

"A. No, I couldn't see it. It was a board \* \* \*.

"Q. Was this board broken that you are speaking about? A. It was broken, but it was a 'blind' board, but I didn't see it. \* \* \*.

"Q. Where were these nails? A. They have them; they are sticking up all around, and you are liable to get them anytime."

The nails served to attach the tops of the cases to their sides, and "sometimes they are as much as half an inch above the case tops, when you loosen them up."

"The Court: And you can see them all the time?

"A. Not all the time you see them. Sometimes you be walking and it hit your foot. You don't take no attention.

"Q. Could you see them as you walked along the top of these cases? A. Well, if you look good enough, but right at that time I wasn't looking.

"Q. Why didn't you look? A. Your Honor, you couldn't look all the time to see those nails, because they don't stick up that high."

On cross-examination by Counsel for McAllister, Reddick said:

"* * * When I struck the nails, I lunged on this broken board, and this right leg went down * * * and I went over like this down on the dock."

Counsel then asked,

"Are you sure the board was broken before you stepped on it?"

Reddick answered:

"Yes, and we never break a board by walking on top of the case. When they are knock-down cases, they put a board on top of the cases, and they hold them up, but this board was broken, because we walk on the cases and they do not break. I couldn't see it broken, but my foot went right down."

From this, it would appear that, perhaps, dunnage boards had been put over the tops of cases, and one of them was defective.

At another point in his testimony, libelant specifically stated that there was no dunnage on top of the cases. He also characterized the broken board as "real thin—* * * a thin board on top."

Robert Baultrip, a member of the gang engaged in unloading the Tyler, was standing on the Tyler's deck nearby the inboard end of the case from which Reddick fell. His description of the situation, as he saw it, is this:

"Well, we hooked up one end of the case, and Reddick was walking to the other end with a crowbar, where we were going to hook up the other end, which he had an opportunity to pry apart, but all of a sudden, I am standing with the wires, he came over the case."

About ten minutes after Reddick's accident, Baultrip went on top of the case from which Reddick had fallen, pried it away from its adjoining case, and saw a broken board, about 1½ feet wide. It had a thickness of one, or one and a half, inches. In his experience of 16 years as a longshoreman, he had never seen cases stowed as closely against each other as those on the Tyler. He said, "You couldn't get a wire sling around them. Cases of that character are usually stowed four or five inches apart, so you can get a wire strap around them."

"The hole in the broken board wasn't too large; it was like a board was broken down."

Baultrip didn't look to see if any nails were protruding above the top of the case.

Gustine Mills, also a member of the unloading gang, saw the case from which libelant fell, after it had been landed on the pier. He saw two cracked boards on its top, about two feet from the end that had been nearby the pier. He further said that cases, such as were carried by the Tyler, are usually stowed with spaces betwen them, of a width of 1½ to 2 feet.

The foregoing evidence, generally speaking, was corroborated by Robert Esdale, master of the steam lighter, Harry Stull, who was called on behalf of libelant as an expert on stowing lighters.

James Dermody, a lighter clerk, formerly employed by Cuba Mail, identified some shipping documents covering the cargo carried by the Tyler, but made no personal inspection of the cases which enclosed some of the freight.

Subsequent to the accident, Baultrip made two statements to representatives of one, or both, of the impleaded respond-

ents. As I read these documents, they tend to confirm, rather than refute, his testimony.

Libelant also made an ex parte statement. It is to the effect that he caught the sole of his right shoe on a nail sticking up on one of the cases, lost his balance, and fell. It makes no mention of a broken board. Reddick said that he signed, but did not read, the statement.

It is worthy of note that, with the exception of the captain of the Tyler, none of the respondents offered a word of proof as to how the cargo was, or should have been stowed.

This circumstance, when considered in the light of the evidence given by Larsen, Reddick, Baultrip, Mills, and Esdale, compels a conclusion that Clark, in the performance of its contract with McAllister, negligently stowed the cargo put aboard the Tyler, and set the stage for what subsequently occurred.

Such fault on the part of Clark, and which McAllister did nothing to correct, subjected libelant to hazards and perils of an unnecessary and unusual nature.

Had Clark properly performed its duty, or if McAllister had corrected such fault, the protruding nails and the broken board, most probably, would not have served as traps to ensnare libelant's feet.

Upon the facts disclosed in this record, it would be unjust to hold that libelant was guilty of contributory negligence, and brought about his accident. By reason of the faults of Clark, and McAllister's failure to correct them, he was forced to deal with an unnecessarily hazardous situation, to which he should not have been subjected.

The wooden plank which gave way beneath libelant's right foot was a "blind" board, and he could not see, or know, that it was defective.

True, it is, that Reddick saw the nails which extended above the tops of the cases on which he worked. He, however, was primarily concerned with the necessity of separating two heavy cases, each of them weighing upwards of a ton, and his mind was centered upon the performance of that task. And, naturally, he forgot about the nails. Most any person, under similar conditions, would have done the same, and I shall absolve Reddick from McAllister's charge of negligence.

As bearing upon McAllister's legal responsibility, if any, in failing to correct the faults committed by Clark, attention is again directed to the testimony of Larsen. In the course of his examination, he was asked:

"Q. Do you have a grab hook on the lighter whereby you can take hold of the cases, and move them without a sling being around the case?

"The Witness: Sometimes we use a grab hook.

"Q. And can't you put that down, and remove these cases if it is necessary to get one away from the other? A. In those cases, when you want to get them apart, or so as to get one case on the side, or where one case is higher than the other, then we put those hooks on, and move the case out so that we can get the slings under that one, but the cases are sometimes in a place where you can't get the hooks on, and then you have to pry them out."

The record does not disclose whether the cargo case from which Reddick fell was within the reach of the grab hooks, and could, by their use, have been moved apart from the one that was stowed closely against it.

Whatever this fact may have been, it is clear that, upon the day of the accident, the grab hooks of the Tyler were not in action.

Following his accident, libelant was placed in an ambulance, and taken to Columbus Hospital. On arrival there, he was given an opiate, and underwent manual, and X-ray examinations. Soon thereafter, his right leg, from the toes of his foot to his thigh, was put in a cast. He carried this device for about two months.

Six days after libelant's admission to the hospital, he was furnished with crutches, and went home to care for a young son, thus permitting his wife to do work elsewhere.

Upon leaving the hospital, Reddick was under the care of Dr. Mario Tagliagambi. On August 8, 1956, the latter reported to the Federal Bureau of Employee's Compensation that libelant had attained maximum benefit from medical treatments, but had a slight permanent defect of his right ankle and leg.

In the meanwhile, and on July 13, 1956, a physician, Dr. A. J. Donan, apparently an examiner for Cuba Mail's insurance carrier, had reported that Reddick was capable of doing his regular work, and had full flexion and extension of his right ankle, and could bear his full weight on his right foot.

Reddick resumed his job on July 17, 1956.

The only oral medical testimony in the case is that of Dr. Robert Tuby, who examined libelant, and took X-rays of his ankle and leg, on March 11, 1957. Doctor Tuby's findings are that Reddick's bone fractures are completely healed. Nevertheless, while he has complete eversion of his right foot, its other movements are limited from five to ten degrees, as compared with those of his left. These limitations are permanent. Libelant also has a systemic arthritic spurring on each of his heels. At the time of Doctor Tuby's examination, Reddick complained of pain in some of his movements. He did so at the trial.

There can be no doubt that libelant, at the time of his injury, and for some time thereafter, suffered severe pain, together with inconvenience and discomfort from the cast on his leg. As previously set forth, he was unable to work from February 15, 1956 to July 17, 1956, and thus deprived of his wages, amounting to about $2,300. He received compensation payments in the sum of $760. His hospital charges, physician's services, and incidental expenses, are not in evidence.

■ Libelant's damages will be calculated as follows:

(1) Liabilities paid, or incurred by, Cuba Mail's insurance carrier for, and in connection with, his injury;

(2) Loss of wages during the period of complete disability;

(3) Pain, suffering, and permanent disability, in the sum of $5,000.

If permitted so to do, I would impose liability upon McAllister and Clark, as joint tortfeasors. Without elaboration upon the matter, I feel bound by the decision in Ryan Stevedoring Co. Inc. v. Pan-Atlantic Steamship Corporation, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, which cites, apparently with approval, Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 213 F.2d 397.

As already seen, neither the contract between McAllister and Clark, nor that between Cuba Mail and McAllister, was in writing, but I shall assume that each of the obligors, Clark and McAllister, was under an "implied warranty of workmanlike service * * *."

Clark breached its warranty to McAllister, by failing to stow the Tyler's cargo properly, and with due regard for the reasonable safety of the stevedores who, in ordinary course, would discharge the cargo at Pier 36.

McAllister, on its part, delivered such negligently stowed cargo to Cuba Mail, and thus failed to furnish libelant, as a business invitee on the lighter, with a reasonably safe place to work. Due to this, Reddick sustained his injuries.

■ Therefore, libelant is entitled to recover against McAllister, and it, under the Ryan case, is entitled to be indemnified by Clark.

The decree will provide:

(1) That libelant recover from McAllister, the amount of his damages, occasioned by his accident on February 15, 1956; and

(2) That McAllister recover from Clark the amount it is required to pay

libelant for the damages sustained by him;

(3) That McAllister's claim against Cuba Mail be dismissed.