258 F.2d 297
 John REDDICK, Libelant-Appellee,
v.
McALLISTER LIGHTERAGE LINE, Inc., Respondent-Appellee-Appellant,
John T. Clark & Son, Inc., Impleaded-Respondent-Appellant, and
New York & Cuba Mail Steamship Co., Inc., Impleaded-Respondent-Appellee.
 No. 249.
 Docket 24916.
 United States Court of Appeals Second Circuit.
 Argued March 14, 1958.
 Decided July 14, 1958.
 Petition for Rehearing Denied August 5, 1958.
 
 Vincent A. Catoggio, of Purdy, Lamb & Catoggio, New York City (Purdy, Lamb & Catoggio, New York City, on the brief), for McAllister Lighterage Line, Inc.
 William F. McNulty, New York City (Hampton & Dietel, New York City, on the brief), for John T. Clark & Son, Inc.
 Morris Hirschhorn, New York City, for libelant-appellee, Reddick.
 William E. Lyons, New York City (Cohen, McGuirk & Michels, New York City, on the brief), for New York & Cuba Mail Steamship Co., Inc.
 Before CLARK, Chief Judge, HINCKS, Circuit Judge, and BRENNAN, District Judge.
 HINCKS, Circuit Judge.
 
 
 1
 The cross-appeals presented in this case are the outgrowth of an injury suffered by the libelant, Reddick, a longshoreman. The various respondents are McAllister Lighterage Line, Inc. ("McAllister"), owner of the lighter, Tyler, on which Reddick was working at the time of his injury; John T. Clark & Son, Inc. ("Clark"), the stevedoring company which loaded the Tyler; and New York & Cuba Mail Steamship Co., Inc. ("Cuba Mail"), the consignee which unloaded the Tyler and which was Reddick's employer.
 
 
 2
 After a trial without a jury the district court, in an opinion which served as the only finding of facts, held McAllister liable to Reddick because of the Tyler's unseaworthiness, and then held that Clark was liable over to McAllister, though the Judge stated that if legally permissible he would have had McAllister and Clark split the damages. McAllister and Clark appeal from these respective rulings. McAllister also appeals from the dismissal of its claim over against Cuba Mail.
 
 
 3
 Concerning McAllister's initial liability to Reddick, the record discloses substantial evidence tending to prove the following facts, some of which were found by the trial judge and none of which were in conflict with his findings. On February 15, 1956, Reddick was part of a gang employed by Cuba Mail engaged in unloading the Tyler at Pier 36 in the Hudson River. The Tyler's cargo included several "knock-down" crates made of pine containing automobile engines which had been stowed one on top of another in tiers of two. There were no dunnage boards or scantlings used in the unloading process and it is evident that at the time of the unloading the crates were so close together that it was impossible to pass the usual slings around them so as to hoist them onto the pier. In order to separate the crates so that the slings could be passed around them and secured, the foreman of Reddick's gang ordered Reddick to mount the top of the uppermost crates and to use a crowbar to separate them. Reddick did as ordered and after separating seven or eight crates he was next seen hurtling over the side of the crates, through the air, and landing on the pier alongside the Tyler. The crates were approximately 10 feet high and Reddick's total fall was approximately 15 feet.
 
 
 4
 As the trial judge below truly indicated, it was hard to tell from Reddick's testimony precisely what happened to cause his fall but the following seems clear. While moving from one side of a crate to the other and while his crowbar was not in use, Reddick stepped on a "blind board" — a board seemingly solid but latently defective. He said that it was this collapse of wood under his right leg that caused him to lose his balance and fall. Reddick also testified that there were several nails sticking up through the tops of these crates. His story varied as to whether he first encountered a nail and then stepped through the board while recoiling from the nail or whether he encountered nails for the first time as he was going over the side of the crate. But we do not think this discrepancy crucial.
 
 
 5
 Supporting Reddick's version of the events was testimony of a fellow longshoreman who was ordered to mount the crates and finish the job begun by Reddick. This witness testified that upon mounting the crate from which Reddick fell he noticed that one of the boards was broken and that the broken piece was hanging down from the edge of the break.
 
 
 6
 Another member of the gang testified that he noticed the broken board when the crate reached the dock and also several nails jutting up through the top of the crate. He also noticed that three or four other boards on the same crate were broken "and all swaying down."
 
 
 7
 The trial judge evidently believed these witnesses. He also absolved Reddick from a charge of contributory negligence, apparently accepting testimony that the defect in the board was not noticeable.
 
 
 8
 None of the foregoing determinations were clearly erroneous. Fed. Rules Civ.Proc. rule 52(a), 28 U.S.C.A.
 
 
 9
 There was also ample testimony to support the finding that the proper way of stowing such crates as these is by leaving space between them for the introduction of the hoisting slings for unloading. There being evidence of a defective crate and of lack of space between the crates when the libelant came on board to unload, we think the judge properly held that the Tyler was unseaworthy and that McAllister was liable to Reddick.
 
 
 10
 There is no doubt that the owner of the vessel is liable to a longshoreman who is injured because of unseaworthiness resulting from improper stowage of the cargo. Ryan Stevedoring Co., Inc., v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; Curtis v. A. Garcia y Cia, 3 Cir., 241 F.2d 30; Amador v. A/S J. Ludwig Mowinckels Rederi, 2 Cir., 224 F.2d 437, certiorari denied A/S J. Ludwig Mowinckels Rederi v. Amador, 350 U.S. 901, 76 S. Ct. 179, 100 L.Ed. 791.
 
 
 11
 The holding of unseaworthiness may also be predicated on the latent defect in the cargo-crate. For if a shipowner is held liable for injury caused by defects in gear brought aboard by the unloading stevedore, Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L. Ed. 803, there is equal reason for holding him liable for injury from a defective cargo-crate which he had received on board and had retained in his exclusive possession and control for the two days preceding the accident. Indeed, the facts of this case provide more solid support for holding the shipowner to absolute liability than did the facts of the Petterson case.
 
 
 12
 We come now to Clark's cross-appeal from the judgment holding Clark liable over to McAllister. The trial judge's opinion shows that he deemed this ruling required under the rule of the Ryan case, supra. He held that Clark breached its warranty to McAllister "by failing to stow the Tyler's cargo properly." [158 F.Supp. 332.] My brothers think the finding on which that holding was based was not clearly erroneous. For my part, I am unable to find evidence which supports that finding. I note that the judge relied upon the following testimony of the Tyler's captain as establishing that on February 13 the crates were stored without space between them.
 
 
 13
 "Q. And do you know whether spaces were left between all cases on this vessel on February 13, 1956? A. Sometimes, he — [the stevedore] places one case, and then he comes in with the next one, and he might shove that one up against the case, or hard against the other case, and he would leave it that way, and he would not move it out.
 
 
 14
 * * * * * *
 
 
 15
 "Q. Did you make any objections when they loaded these cases right flush against each other? A. I make objection sometimes, but they would not listen to me. They would leave them there. They haven't time to move them out. If I said anything, they would not take anything else."
 
 
 16
 But although these questions were specific the answers given were merely generalities. The captain says only that "sometimes" some stevedores stow without interstitial space between crates: although he was there and receipted for the cargo he did not testify that it was stowed improperly.
 
 
 17
 In its brief on this point, McAllister, apparently recognizing the absence of evidence of improper stowage on February 13 at Pier 92, relies completely upon Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 48 F.2d 105, for the proposition that it is reasonable to infer that something existing today existed the same way at an earlier point of time. There being ample evidence that there was no space between crates when Cuba Mail began to unload the lighter at Pier 36 on February 15, it may be presumed that the crates had been so stowed by Clark on February 13 at Pier 92 — so McAllister's argument runs. The Berwind-White case is distinguishable. It went no further than to sanction a presumption that a broken pile, which by its very nature was a stationary object, "had remained in situ for a considerable time prior to the accident." I think the presumption should not be extended to the movable crates involved here which for two days had been in McAllister's control on the Tyler which had been moved by it from Pier 92 to Pier 36 perhaps in water rough enough to cause the crates to slide together and thus close a four inch space [all that was necessary], especially if on a slanting deck. For aught that appears, after proper stowage by Clark the crates may have been shoved together to make room for more cargo or room for passageway on the lighter's deck. And on or after arrival at Pier 36 the Tyler may have bumped the pier with force enough to move the crates a few inches. These possibilities are not negated by the weight of the crates. For concededly a single longshoreman could separate the crates with a crowbar, notwithstanding their weight. I think the presumption sanctioned in the Berwind case not applicable to the situation here at least without evidence to negate these possibilities. Such evidence, if it existed, was within the reach of McAllister who received and controlled the cargo and moved the lighter. And on McAllister rested the burden of proof. Such, at least, are my individual views on this issue.
 
 
 18
 However, even if it was properly found that Clark by improper stowage breached its implied warranty of workmanlike service to McAllister, a majority of the court thinks there is no showing that this breach caused Reddick's injury. The Ryan case, supra, and the recent case of Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, indicate that when dealing with contractual indemnity in this type of situation the application of tort theories of liability, i. e., "active" or "passive" and "primary" or "secondary" negligence, is inappropriate. Under the general test of foreseeability applied to contractual liability, the breach must have been the cause of the injury. We think that in this case the latent defect in the board on the top of the crate was an intervening cause which broke any causal chain that might otherwise have existed. The only result of improper stowage was to cause a man to walk on top of the cases and use a crowbar to pry them apart. If Reddick had been injured while trying to climb to the top of the crates, his injury might have been the foreseeable result of improper stowage and Clark in that event would have been liable over to McAllister. But Clark would not necessarily be liable for every conceivable mishap that Reddick might have encountered while on top of the crates. The evidence in this record indicates that the tops of these crates were made of pine boards which were between 1 and 1½ inches thick. It was also shown that longshoremen frequently walked along the top of these crates without using dunnage boards and, indeed, an expert testified that dunnage boards are never used on the tops of these crates when unloading. If the crate to be moved is obviously weak and damaged the longshoreman stands on adjoining crates. There is nothing in this record to indicate that a 1-inch pine board was incapable of supporting the weight of a long-shoreman if the wood was in good condition. Thus, we conclude that, even assuming proof of Clark's improper stowage, Reddick's injury was due to defects in the crate not foreseeable by Clark and hence not caused by improper stowage.
 
 
 19
 McAllister's appeal against Cuba Mail relies upon the fact that Cuba Mail did not furnish Reddick with dunnage boards or scantlings. However, the evidence already considered indicates that without such equipment knock-down crates might be properly unloaded. Further, as we have indicated, there was no evidence that the pine board in good condition would not have supported Reddick's weight.
 
 
 20
 Libelant's recovery from McAllister is affirmed;
 
 
 21
 McAllister's recovery over from Clark is reversed; and
 
 
 22
 The dismissal of McAllister's claim against Cuba Mail is affirmed.
 
 
 23
 CLARK, Chief Judge (dissenting in part).
 
 
 24
 I concur in holding McAllister liable to the plaintiff, for it is evident that the plaintiff was injured because of unseaworthiness resulting from improper stowage of cargo aboard the Tyler. But I disagree with the decision which absolves Clark, the loading stevedore, from the liability placed on it by the district court to indemnify McAllister for the damages recovered by the plaintiff. To render Clark liable, under the tests stated in Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, and Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491, the record must support two critical findings establishing breach of its implied warranty of workmanlike service for proper loading and stowage. First, it must be shown that Clark improperly loaded the cargo which the plaintiff mounted during the unloading operations. Second, the plaintiff's injury must have been a foreseeable result of the improper stowage. But the evidence seems to me quite adequate to support these findings, and I perceive no sufficient basis to reverse the judgment entered below against Clark.
 
 
 25
 The crated cargo which Clark loaded aboard the Tyler consisted of automobiles (2¼ tons per crate), automotive parts (1,165 pounds), a diesel engine (2¼ tons), and textile machinery (2½ tons per crate). It is unquestioned that on the day of the accident these crates were too close together to permit the stevedores to unload them without mounting the uppermost ones and separating them with a crowbar. The record amply shows that the proper way to load such crates is to leave a space between them sufficiently large to allow for the introduction of hoisting slings. The question is, therefore, whether Clark was responsible for this patently improper stowing.
 
 
 26
 Two factors support the affirmative conclusion reached by this experienced trial judge. First, we may presume, in the absence of contrary evidence, that heavy crates, otherwise properly loaded, do not shift when placed on the deck of a lighter. The normal presumption is that a condition found to exist at a certain point in time existed in a similar fashion at a prior time unless contrary evidence is adduced to show the likelihood of change. Berwind-White Coal Mining Co. v. City of New York, 2 Cir., 48 F.2d 105, 107. True, the facts in that case differed from those present here; but as we said there, "Such is the general inference, the strength of which is dependent upon the particular circumstances of the case and the likelihood of the duration in the past of a state of facts found to be existing at present." Here the inference is strong. Although some thirty-eight hours passed between the loading and unloading of the cargo, the Tyler remained moored at the pier and in the North River for a major portion of that time, and eventually it was towed only a relatively short distance to another pier on the same river. The significant fact is that the crates were particularly heavy. It is most unlikely that they would shift position in the absence of heavy weather conditions or some unusual occurrence, none of which have been shown. As the opinion demonstrates, it is entirely possible to speculate on factors which might have caused movement. But in the posture of the case I believe that Clark, in order to avoid liability, should have shown facts from which it could have been reasonably inferred that the crates shifted after loading. My brothers stress that the Tyler was under the control of McAllister during the period prior to unloading, and that therefore it should be charged with the burden of proving that no unusual circumstances occurred which would account for shifting. But Clark loaded the vessel, and if its men did their jobs properly it certainly should have been able to produce at least one witness to testify to this fact. At the trial, however, Clark failed to produce such a witness.
 
 
 27
 The second factor of importance was the testimony of the Tyler's captain, Lars Larsen. My brothers characterize his answers to questions relating to the stowage as general, rather than specific, thereby suggesting that Captain Larsen was speaking about his general experience with stevedores, and not about what occurred on the specific day in question. I do not believe that conclusion is supportable. At worst the witness' testimony was ambiguous; we are not in a position to say that the district judge who heard it, and specifically relied on it in support of his findings, was incorrect. The witness may well have communicated his exact meaning by gesture or expression. There is always danger in interpreting the subtleties and nuances of testimony simply by examining a cold record. Here a judge of vast experience observed the witness and had no difficulty understanding his meaning. I am willing to rely on his conclusions. Moreover, on cross-examination the following testimony was elicited from Larsen:
 
 
 28
 "Q. Captain, when the discharging of your lighter was started on February 15, 1956, will you state whether or not the cargo on your lighter was in the same condition as it was when loaded on your lighter at Pier 92? A. Yes, it was in exactly the same condition; nobody touched it."
 
 
 29
 Although the word "condition" is somewhat indefinite, it seems clear that in this context Larsen was speaking about the position of the cargo, for there was no claim in the case for damage to cargo.
 
 
 30
 The resolution of the second issue raised here — whether the plaintiff's injury was a foreseeable result of the improper stowing — depends in large part on the importance attributed to the "intervening" event which is said to break the causal relationship between Clark's dereliction and the plaintiff's injuries. The majority suggests that tort theories of liability are inappropriate here and that "[u]nder the general test of foreseeability applied to contractual liability, the breach must have been the cause of the injury." Although this might be taken to mean that the test of "cause" applicable in actions for the breach of consensual obligations differs from that normally applied in negligence situations, it would seem apparent from an examination of cases involving the breaches of implied warranties that the tests are essentially the same. See 2 Harper & James, The Law of Torts, §§ 28.16 et seq. (1956).
 
 
 31
 Here it is suggested that the plaintiff's fall was "caused" by defects in the crate, and not by Clark's improper stowing. But this means no more than that my brothers think Clark could not foresee that its negligent stowing would cause injury to a workman in the manner here disclosed. If the plaintiff had fallen because of a gust of wind, a ripple in the tide, or, as my brothers suggest, while climbing up the crates, Clark would be liable, for concededly these events are reasonably foreseeable risks from loading the crates too close together. But is it any less foreseeable that the crates the workman will be forced to climb might have latent defects, or might not support a heavy person, or might have nails protruding from them? I think not. Moreover, it was Clark's negligence which required the plaintiff to mount the crates, where he was vulnerable to injuries from falling. That the accident occurred because of a hazard for which Clark was not responsible should not insulate it from liability. As the district court aptly said, Clark "set the stage for what subsequently occurred." D.C.S.D.N.Y., 158 F.Supp. 326, 331. The presence of a reasonably foreseeable hazard ought not to absolve it from its responsibilities. Hence I would affirm the reasoned decision below.
 
 On Petition for Rehearing
 
 32
 PER CURIAM.
 
 
 33
 The petitioner urges that in exonerating Clark we have disregarded admonitions in Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 355 U.S. 563, 78 S.Ct. 438, 441, 2 L.Ed.2d 491, and have applied tort principles to the breach of the contract here involved. We do not agree. When Clark's contract was made (and indeed when it was breached, if that be important which we doubt) we think it could not reasonably have foreseen that its failure to leave space between the crates would probably result in injury to an unloading stevedore or that it "foreseeingly led to petitioner's liability" to a stevedore, — in the language of Weyerhaeuser. In the process of unloading an arm or leg might have been crushed between these heavy crates if they had been stowed with space between. We think Clark's breach was one which did not make "the injury foreseeable as more likely to occur * * * and to mulct him * * * does not attain the purpose for which law and remedies exist. Charging him with damages merely shifts the loss without affecting the future by making such injuries less likely to occur. If the shifting of the loss is itself a desirable object, it should be attained by legislation dealing frankly with insurance, and not by a costly damage suit against the wrong man." Corbin on Contracts, Vol. 5, p. 61.
 
 
 34
 The vastly extended scope of the warranty of seaworthiness under recent Supreme Court decisions has already shifted the stevedore's loss. The humanitarian objective of those decisions will not be furthered by judicial decisions which shift the stevedore's loss from one underwriter to another. And so we leave the loss on McAllister (and its underwriters) being convinced that under the doctrine of causation and foreseeability in the field of contracts that is where the loss belongs. Corbin on Contracts, Vol. 5, § 1006 et seq.
 
 
 35
 Petition denied.
 
 
 36
 CLARK, Circuit Judge, dissents for the reasons stated in his previous dissent in this case.