Michele CARABELLESE, Plaintiff-Appellant,

v.

NAVIERA AZNAR, S.A., Defendant and Third-Party Plaintiff-Appellee,

v.

INTERNATIONAL TERMINAL OPERATING CO., Inc., Westinghouse Electric International Company and Westinghouse Electric Corporation, Third-Party Defendants-Appellees.

No. 30, Docket 26165.

United States Court of Appeals Second Circuit.

Argued Sept. 29, 1960.

Decided Nov. 25, 1960.

Robert Klonsky, Brooklyn, N. Y. (DiCostanzo & Klonsky, Brooklyn, N. Y., on the brief), for plaintiff-appellant.

Walter X. Connor, of Kirlin Campbell & Keating, New York City (George T. Delaney and Dominic J. Calabrese, of Kirlin Campbell & Keating, New York City, on the brief), for defendant and third-party plaintiff-appellee.

Before LUMBARD, Chief Judge, and TUTTLE * and FRIENDLY, Circuit Judges.

* Of the Fifth Circuit, sitting by designation.

FRIENDLY, Circuit Judge.

Carabellese, a longshoreman, appeals from a judgment of the District Court for the Southern District of New York dismissing his complaint against Naviera Aznar, S.A., a Spanish corporation, owner of the S.S. Monte Urquiola, after answers by a jury to special interrogatories, and from the denial of plaintiff's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

Plaintiff was injured by the fall of a heavy crate during the loading of the Monte Urquiola at Hoboken on September 28, 1955. The vessel had arrived three days earlier with 5,787 tons of cargo; an additional 1,281 tons were to be taken on. She was moored with her port side along the pier. International Terminal Operating Co., here impleaded as a defendant by the owner, conducted the loading. Seven large and heavy wooden boxes containing electrical control centers manufactured by Westinghouse Electric Corporation and packaged by Westinghouse Electric International Co., also impleaded as defendants, were among the cargo to be loaded.

Plaintiff was a holdman employed by the stevedoring company. He was part of a gang of 22 men working under a hatch boss, Sasso, in stowing cargo in the No. 2 upper tween deck. The evidence was that each Westinghouse crate contained a large steel cabinet with a number of compartments which in turn contained complex electrical apparatus; photographs would indicate that the bottom compartments were somewhat less full than those above but there was no satisfactory evidence as to how the weight was distributed among different parts of the cabinet. A Westinghouse employee in charge of shipping and export crating testified that the instructions and regular practice were to bolt the bottom of the cabinet to a wooden skid and then construct the case around the cabinet, that there was no open space at the bottom of the case but there were a few inches of open space on the sides and top, and that the boxes were marked to indicate where the loading slings were to be placed. The chief mate of the vessel, who witnessed the accident, testified that the crate that fell was plainly marked to indicate which side should be up; Sasso had likewise said this in a prior statement but denied it at the trial. We shall take it that the box that injured plaintiff measured 33 inches in width, 101 inches in height and 135 in length, and weighed 4,550 pounds.[1]

The box whose fall caused the accident was to be stowed in the forward wing of the 'tween deck. The stevedores encircled it with two slings, one on the forward and one on the aft end of the draft, and then lowered it to a point on the deck somewhat to starboard of the center line. The crate was positioned so that it would rest on the surface that we take to be 33 inches in width and 135 in length, with the width facing forward. A roller was placed under the front end of the crate and the forward sling was removed. The crate was then raised by the after sling and was pushed forward by the holdmen, plaintiff among them, on the port side, and by a few on the after end.[2] So far there is no conflict in the evidence.

Sasso testified that the forward motion of the crate was stopped by the sling coming in contact with the coaming of the hatch, that it then became necessary to slacken the sling and that at this time the crate toppled over to port and pinned the plaintiff. He attributed the fall to the "top-heavy" character of the crate, to the failure to provide lumber or shoring for the sides of the draft, and to a list to port which he thought was occasioned by the prior loading of two of three loco-

1. There was some dispute whether the particular case was 135″ or 115″ long; the shipment contained one case of the former length, three of the latter, and three smaller cases. The weight of the 115″ cases varied between 4125 and 4360 lbs. We do not believe anything depends on which of the four larger cases was the one that fell.

2. It was impracticable to station men on the starboard side of the crate because that portion of the tween deck was full of cargo.

motives on the port side.[3] Two policemen who boarded the vessel shortly after the accident also testified they had noted a list to port. A former master called by plaintiff as an expert witness gave his opinion, in answer to a hypothetical question, that it was improper to load a case of this size and type into the place where this case was destined, since it "should be landed in an area where it needs the least handling," and that a list would be sufficient to topple it over.

For the defendant the chief mate testified that the Monte Urquiola had no list. He attributed the fall to an order given the men to turn the crate; he said that when they attempted to do this, the crate started to fall over and the cargo sling snapped off just before the crate struck the deck. Defendant also called an expert in stevedoring. He accounted for the fall on the basis that, since the crate had not been spotted in a direct line with the head of the boom, as the crate was moved forward the sling would exert pressure on the outboard side, which caused the crate to lean inboard and topple over. He thought the stevedore's method of loading the crate was improper, that several rollers should have been placed under the crate, and that it should then have been moved into position by crowbars.

3. After this testimony was given, it developed that the locomotives were not in fact loaded until after the accident, although, in an answer to an interrogatory, defendant had previously assigned an earlier date for their loading.

4. "1. Are you persuaded by a fair preponderance of the credible evidence that an unseaworthy condition existed on board defendant's vessel in that the place in which plaintiff was required to work or defendant's equipment was not reasonably safe and suitable for use in loading the case involved in the accident? No.
"If your answer to question 1 is in the affirmative please indicate which, if any of the following findings you have made in reaching your conclusion that an unseaworthy condition existed:
"(a) The case was top-heavy and unstable. No.

The case was tried upon two theories of liability—unseaworthiness of the vessel and negligence of the owner. The court submitted special interrogatories to the jury. The first, which contained various sub-interrogatories, dealt with unseaworthiness, the second with negligence, and the third, to be answered if either of the first two was answered in the affirmative, with proximate cause. Further interrogatories were submitted with respect to damages, these to be answered if the jury answered in the affirmative either the question as to unseaworthiness or that as to negligence and also the question as to proximate cause. The jury answered the questions as to unseaworthiness and negligence in the negative; it did not answer those as to proximate cause or damages. We set forth in the margin the questions propounded on unseaworthiness and the jury's answers thereto.[4]

After the jury had given its answers, defendant moved for judgment against the plaintiff; this was granted. Thereafter, plaintiff moved for judgment notwithstanding the verdict or, in the alternative, for a new trial; this was denied. Although we have considered all of plaintiff's complaints, only two of the errors alleged require discussion.

"(b) Bracing or supports were necessary and they were lacking. No.
"(c) The vessel had a port list which made it impossible for the case to stand on the #2 upper 'tween deck on its 33 inch width without independent support. No.
"(d) The physical condition of the forward bin of the #2 hatch upper 'tween deck was not reasonably safe for the loading operation because it was empty and the handling of the case required independent support at its side either by the presence of other cargo so stowed as to provide such support, or by independent mechanical devices. No.
"(e) The failure of the First Mate, Mr. Itturiaga, to direct the stevedore to take corrective measures with respect to:
"a) ..................... No.
"b) ..................... No.
"c) ..................... No.
"d) ..................... No."

1) The charge which the judge had prepared for delivery included the following:

"The plaintiff did not assume the risk of an unsafe place to work, nor is he chargeable with negligent conduct on the part of his co-employees or superiors. Indeed, plaintiff is not chargeable in this case with contributory negligence in any sense, and I charge you, as a matter of law, that plaintiff was not contributorily negligent."

When the court entertained exceptions to the charge, the following occurred:

"Mr. Klonsky [for plaintiff]: I had asked you if the imputation of negligence request would be granted and your Honor said yes, which meant that though the hatch boss may have been negligent or any of the co-workers of the plaintiff may have been negligent, therefore it is not imputed to the plaintiff.

"The Court: I charged that. You weren't listening, Mr. Klonsky, you were looking at your notes. I charged that in the very words you requested.

"Mr. Klonsky: I hope so, your Honor."

However, the stenographer's transcript indicates the above-quoted portion of the prepared charge was not in fact given.

■ In denying plaintiff's motion for a new trial, the judge, regretting his apparent failure to read the instructions he had prepared, concluded that the omission was not prejudicial in view of other instructions that had been given. We agree. In an early portion of his charge, the judge informed the jury that counsel for the defendant and for the plaintiff "have both stipulated that the plaintiff is not chargeable with contributory negligence, so that has taken another aspect of the case out that would normally come into it at this time." He also instructed the jury that it might find the shipowner liable either for unseaworthiness or for negligence even though the longshoremen were also responsible. These instructions seem to have disposed of two of the points intended to be covered by the inadvertently omitted charge. At no time during the trial did defendant contend that plaintiff was barred by assumption of risk or by the negligence of himself or his fellow workers. No such issues were submitted to the jury; it was asked to determine only whether the vessel was unseaworthy, whether the owner was negligent, and if so, whether unseaworthiness or negligence proximately caused the accident. The case thus appears similar to De Pascale v. Pennsylvania R. Co., 3 Cir., 1950, 180 F.2d 825, 827, where refusal to charge on assumption of risk was held not to have been prejudicial under the circumstances, and unlike Blankenship v. Ellerman's Wilson Line New York, Inc., 4 Cir., 1959, 265 F.2d 455, at page 459, where the trial judge improperly submitted the issue of assumption of risk to the jury and the Court of Appeals feared this might have led the jury to have made a negative finding with respect to unseaworthiness "on the ground that the plaintiff knowingly assumed the risk and that this action on his part rather than the failure of the ship was the cause of his injury".

■ 2) The judge instructed the jury:

"If you find that the case which fell on the plaintiff was top heavy and unstable, but you reject all the other contentions raised by the plaintiff, you may not find that the vessel was unseaworthy. * * *

"On the other hand, if you find that the case was top heavy and unstable, you may consider whether that factor in combination with some other factor claimed by the plaintiff such as a list of the vessel, the physical arrangement of the tween deck area, or the absence of bracing equipment for the case, or the failure of the chief mate to direct the stevedore to take adequate measures to counter the risk of harm created by any unsafe condition, rendered the place in which plaintiff was required to work unsafe. In other words, al-

though the case considered by itself would not constitute an unseaworthy condition, you may find that the condition of the case plus one or more additional factors combined to create an unseaworthy condition."

Appellant excepted "to the Court's refusal to charge * * * that the top heaviness or instability of the case of cargo on the vessel would in itself be sufficient to prompt unseaworthiness." We find no error in the charge as given or in the refusal to charge as plaintiff requested. Moreover, if we thought otherwise, we would conclude there was no prejudice as to plaintiff under the circumstances.

Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, settles that a vessel cannot avoid liability for unseaworthiness merely because the owner has had no opportunity to remedy the unsafe condition. Alaska S.S. Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, and Rogers v. United States Lines, 1954, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120, settle that a vessel cannot escape being cast as unseaworthy for an unknown defect in gear normally a part of the vessel's but there brought on by a stevedore. In these cases the defect that caused the injury related either to the vessel itself or to "the proper appliances appurtenant to the ship," The Osceola, 1903, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760, whereas here the alleged defect was in a piece of cargo. However, we held in Palazzolo v. Pan-Atlantic S.S. Corp., 2 Cir., 1954, 211 F.2d 277, 279, affirmed with respect to another point in Ryan Stevedoring Co., Inc. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, that since "Proper stowage is an element of seaworthiness," the owner was liable for unseaworthiness to a longshoreman injured as a result of the prior improper stowage of cargo that he was unloading. Accord, Amador v. A/S J. Ludwig Mowinckels Rederi, 2 Cir., 1955, 224 F.2d 437, certiorari denied 1955, 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791; Gindville v. American-Hawaiian S.S. Co., 3 Cir., 1955, 224 F.2d 746. In Reddick v. McAllister Lighterage Line, Inc., 2 Cir., 258 F.2d 297, 299, certiorari denied 1958, 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229, where again the injury was in the course of unloading, the majority held that unseaworthiness could be predicated not only on improper stowage, as in the cases just cited, but also upon a latent defect in a cargo crate which gave way when the plaintiff longshoreman stepped upon it. However, the majority noted that the crate had been in the owner's "exclusive possession and control for the two days preceding the accident." Since there was no evidence that the owner had known or could have known of the latent defect, this must have been designed to bring out that the crate had in effect become a part of the working surface supplied to the longshoreman, so that the owner would be liable for a latent defect in the crate as he would for one in the deck or even, as was held in Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, for a misplaced cover which the injured longshoreman had himself installed over part of a hatch. The same principle underlies Rich v. Ellerman & Bucknall S.S. Co., 2 Cir., 1960, 278 F.2d 704. That, like the instant case, related to an injury sustained in loading, but the unseaworthiness lay in the stowage of truck chassis previously loaded which turned out to afford an unstable footing. Thus the chassis in Rich, like the crate in Reddick and the hatch cover in Grillea, had become, as was said in the Grillea case at p. 923, "as much a part of the 'tweendeck for continued prosecution of the work, as though it had been permanently fixed in place."

We may assume the cited decisions would govern if the Westinghouse crate had been improperly stowed and had fallen on the plaintiff as he undertook some later operation. But we know of no case that has imposed absolute liability on the owner where the alleged danger was inherent in the cargo and this was still in the course of being loaded. Hence the question posed is whether the owner warrants to longshoremen not simply a

safe place in which to handle cargo but cargo which is safe to handle.

We are not disposed so to extend the doctrine, at least on the facts here. Almost any cargo presents some hazard in handling. Arena v. Luckenbach S.S.Co., 1 Cir., 1960, 279 F.2d 186, 187, certiorari denied 1960, 81 S.Ct. 222, dealt with a particularly unstable kind, rolls of printing paper. Yet the Court of Appeals sustained the direction of a verdict for the defendant in the absence of "proof of defective or improper equipment." We need not here determine whether an owner might be absolutely liable for a defect making the cargo so hazardous that it could not be safely loaded even with all all precautions the stevedore might reasonably take. Here there was no substantial evidence that the box could not have been loaded with proper handling.

■ If unseaworthiness may ever be based solely on a dangerous condition in cargo that is being loaded, there must be more substantial proof of unusual hazard than plaintiff offered here. His expert testified only that it was a mistake to load the box in a place requiring so much handling and dangerous to do so on a vessel with a list. Although there was much talk of topheaviness at the trial, the term was never defined. Surely a vessel is not to be deemed unseaworthy simply because it is to carry objects that are heavy, long and high and rest on their narrow width; tall and narrow cargo must travel by sea as well as short and squat, electric control centers as well as automobiles and sacks of flour. There was no evidence that the normal distribution of weight within the cases was such as to produce an unreasonable risk of fall; no proof was adduced as to how wide a departure from the vertical could be tolerated. Westinghouse did not regard the cabinets as hazardous; it regularly permitted them to stand free on the floor, without bracing or bolting, both in manufacturing and crating. It boxed approximately ten similar cases for export and thirty or forty for domestic shipment every month, and there was no evidence of any other mishap, although in the domestic shipments the cabinets were not even bolted to the bottom of the crates. All the other cases in the shipment here in question—three of which differed only in being 20 inches shorter—were loaded without incident, three of them before the accident, and all were so unloaded.

Neither was there sufficient evidence to warrant a finding that the particular case significantly departed from the norm. The only evidence as to this came from plaintiff's boss, Sasso. He said that "when she came down on the roller, she wobbled, you could see right away it was heavy on top." This was highly inconclusive; a large and heavy case like this could well "wobble" for a moment when placed on a roller without being dangerously unstable. On redirect examination Sasso was permitted to testify that one of the operators of the loading equipment on the dock "said twice it almost fell over"; this hearsay was likewise inconclusive since the near fall could have been due to improper maneuvering as well as to dangerous instability. Finally, Sasso testified that the accident caused an opening in the crate, which he first described as five inches of the forward port corner and later expanded to five inches "all along the length of the crate," and that this opening revealed "that all the machinery was all the way on the top, the top of the case" with legs of the machinery at the bottom. This testimony, given more than four years after the event, was in sharp contrast to a statement, signed nearly three years earlier, in which he said the fall did not damage the crate. That also was the testimony of the mate. In any event, it would have been quite impossible for Sasso to have observed the distribution of the electrical equipment within the steel cabinet; the utmost he could have seen would have been the position of the cabinet within the case, and that, of course, might have been altered by the fall. Furthermore, the Westinghouse witnesses testified that machinery of this sort was never mounted on legs. On this basis there was no evidence on which a jury could have been allowed to find that the case could not have been

loaded with proper precautions in suitable space on a vessel without a list. Yet the charge permitted the jury to find unseaworthiness if the condition of the case when combined with other factors, such as a list of the vessel, the physical arrangement of the 'tween deck area, the absence of bracing equipment, or the failure of the chief mate to direct the stevedore to take adequate safety measures, rendered plaintiff's working place unsafe.

■ Beyond this, even if the challenged instruction were erroneous, it could not have been prejudicial to the plaintiff here. For the jury found that the case was not topheavy and unstable, see footnote 4.

The jury did not content itself with a general conclusion of unseaworthiness; it took each element which on the judge's instructions might support a conclusion of unseaworthiness either alone or in combination with others, and made a specific finding thereon. Appellant asks us to disregard the finding that the case was not topheavy and unstable, on two grounds. The first is that the court had told the jury not to answer the questions as to specific elements going to unseaworthiness unless it answered the general question in the affirmative. Literally, that is so, but the common sense of the matter is that the judge simply was not requiring the jury to answer the specific questions unless it returned an affirmative finding on the general one—not that he was forbidding the jury to arrive at its general conclusion on unseaworthiness, affirmative or negative, by considering the separate elements, and to give him the benefit of its specific findings if this was what it did. Indeed, he noted, on the return of the verdict, that "you followed the instructions and have not gone any further, since you have answered in the negative to both 1 as well as 2 and all the subdivisions of 1." Since the jury had literally followed the instruction that it need not answer the question as to proximate cause unless it had answered either the question on unseaworthiness or that on negligence in the affirmative, its making of specific findings on each alleged element of unseaworthiness seems particularly significant. The other ground is that the jury, having been told that topheaviness of the case alone would not support a conclusion of unseaworthiness, would not give due attention to the issue whether in fact the case was topheavy. But this ignores the instruction that topheaviness of the case would warrant a finding of unseaworthiness if one of the other elements was present; hence it remained important for the jury to determine whether the case was topheavy, and there is no reason to suppose that the jury, which deliberated for two and a half hours, was casual about this. Plaintiff has had the determination of one jury that the crate was not topheavy and unstable; we see no reason why he should have that of another, even if topheaviness of the crate alone, if established, would make the vessel unseaworthy, which we do not believe.

This case is another extreme example of the failure of counsel, both experienced practitioners in this Court, to make any attempt to comply with our Rule 15(b), 28 U.S.C.A., with respect to appendices. Appellant's appendix contained none of the evidence, and we would have been warranted in dismissing the appeal or affirming on that ground. See Sparrow v. Yellow Cab Co., 7 Cir., 1959, 273 F.2d 1. Appellee's appendix contains only some extracts from Sasso's pretrial statement. We invite the attention of all counsel to the remarks on this subject of appendices in United States v. Lefkowitz, 2 Cir., 1960, 284 F.2d 310.

Judgment affirmed.

LUMBARD, Chief Judge (concurring).

I concur in the opinion of the majority except for the alternative holding regarding the jury's response to the interrogatory on topheaviness. Since the correctness of the instructions disposes of the case, I would not decide whether the answers given by the jury on the particular interrogatories, which it was told to disregard if it decided that there had been

no unseaworthiness, constituted jury findings. The jury may well have failed to focus its full attention on the determination of a fact issue which had been made irrelevant by its more general finding pursuant to the trial judge's instructions, particularly in light of the sequential form taken by the special verdict.