Alphonse SERRANO, Libelant,

v.

UNITED STATES LINES COMPANY
and United States of America,
Respondents.

UNITED STATES of America et al.,
Petitioners,

v.

AMERICAN STEVEDORES, INC. and
Morace Stevedoring Co., Inc.,
Respondents-Impleaded.

United States District Court
S. D. New York.

Feb. 5, 1965.

Zimmerman & Zimmerman, New York City, for libelant; Morris Cizner, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for respondent United States Lines Co.; William J. O'Brien, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., for respondent United States; Louis E. Greco, Atty. in Charge, Admiralty and Shipping Section, Dept. of Justice, Philip A. Berns, New York City, of counsel.

George J. Conway, New York City, for respondent impleaded American Stevedores, Inc.; John F. X. McKiernan, New York City, of counsel.

Terhune, Gibbons & Mulvehill, New York City, for respondent impleaded Morace Stevedoring Co., Inc.; Edmund J. Fanning, New York City, of counsel.

DIMOCK, District Judge.

This suit is brought by Alphonse Serrano, a marine carpenter, to recover for personal injuries occasioned by the explosion of a tire on a Government trailer aboard the SS American Leader at its Brooklyn Army Base pier. United States Lines Company, the vessel owner, and United States of America, space charterer, were named as respondents. Each, in turn, asks indemnity against the other should it be held liable, and the Government has impleaded American Stevedores, Inc. (American) and Morace Stevedoring Co., Inc. (Morace), its contractors in connection with the loading.

At the time of the accident, libellant Serrano, as part of the process of chocking an army stake and platform trailer, S & P Trailer #1068, which had been backed into the starboard aft pocket of the lower hold of hatch #3, was crouched under the right or outer side of the trailer in front of its tires putting into place a chocking "stringer" when the inner of the trailer's double tires on the side opposite him (the left front set) blew out. The rush of air from this explosion blew Serrano over and back against a rib and angle iron of the ship, and the loud report caused significant damage to his ears. The blowout left the tire with a triangular gash perhaps six inches long in its side wall about eighteen inches off the ground.

So much for the accident itself. Less clear are its causes and the responsibility therefor.

S & P Trailer #1068, fully loaded, was hauled to Brooklyn Army Base from Raritan Arsenal. A twelve ton trailer, its weight loaded was over 39,000 pounds. While the heaviest of the loaded trailers to go aboard the American Leader, its load was below its rated capacity of 18 tons. At the Base its tires were checked externally for defects and none found. No test was made of tire pressure since none was required by army procedure. The trailer was pulled over a smooth base road alongside the ship where it was

picked up by an army derrick and loaded into hold #3. Morace's function, so far as relevant here, was to inspect the items being loaded, and its men noted no defect.

In accordance with the plan provided by the army's employee, John Alex, American's subcontractor had welded padeyes in lower #3 for use in lashing the trailers. American was also responsible under its contract for the stevedoring and carpentry work, although under the oversight of Joseph Murtha, the army Marine Superintendent.

After the derrick had deposited #1068 in the square in the lower hold of hatch #3, it was jockeyed into its assigned position in the starboard aft pocket by an army Coleman tractor driven by army employee Edwin Russell. Just before or shortly after the tractor had disengaged, just as Serrano and his work partner were commencing chocking, the tire exploded and Serrano was injured.

Libellant, who alleges both unseaworthiness and negligence, advances a number of points which might support the latter theory. It is his position that the deck of lower #3 was littered with debris, left over nails from the dunnage of prior voyages and discarded ends of welding rod, and that this debris may have caused the blowout. On this point, the weight of the evidence is clearly against libellant. The testimony of his witnesses is contradicted by Russell, the Coleman tractor driver, and by Murtha and Alex. Had there been such debris, the army could have ordered a detention of work for cleaning, a delay which would have been chargeable to the ship, rather than the army, and the debris would have been removed. Moreover, Thomas Macy's, the army tire expert, testified that blowouts are not caused by punctures. Hence, it would seem that even had there been sharp edged debris, and I am of the opinion that there was not, it would not have caused the accident here.

Libellant asserts that there is actual or circumstantial evidence of three other items and maintains that in some combination they caused the accident. They are inadequate tire pressure, excessive weight of the trailer, and the passage of the tire over a padeye.

The army manual in force at the time of the accident prescribed a pressure of 50 pounds for the type of tire in question. Since that time, the army has increased its standard pressure for this tire to 75 pounds. There was no pressure test at the army base, so it is possible that the pressure was below the 50 pound level and that the tire was somewhat underinflated. Underinflation, respondent's witness Macy's testified, can cause internal rupture of the tire and blowout. Evidence also indicated that the greater the weight on a tire, the greater the stress and the greater the need for air pressure. Despite these facts, I cannot conclude that underinflation was the cause of this accident. The tire involved here, described as an 1100 x 20 tactical tire, 12 ply rated, is designed for use over combat terrain as well as on smooth road surfaces. Rupture and blowout of a sound tire could come about because of a combination of three factors: tire pressure, weight and terrain. Assuming that the pressure was somewhat lower than optimal, it was not so low as to be discoverable by the visual inspection or by the test, used by the army here, of hitting the tire with a two pound mallet. I must conclude that the pressure was well above 15 pounds, a pressure at which this tire can safely be used, according to the evidence, over rough combat terrain. The trailer load here, some thirteen and a half tons, was somewhat above the combat load maximum of twelve tons. It was, however, well below the non-combat maximum of eighteen tons. Moreover, the surfaces over which it traveled, the base road, the farm area, the hold deck, etc. were described as smooth.

One exception must be made to this description of smoothness of surface, the presence of padeyes jutting up from the hold. It is possible that a trailer as the one here with as heavy a load, and somewhat underinflated tires, might by run-

ning a tire over such a protruding object as a padeye cause a blowout.

I conclude from the evidence here, however, that the trailer did not run over a padeye. The sole evidence indicating that it might have done so was that of libellant's witness Folino, who testified that he saw the trailer rock as it was backed off the square of the hatch toward its destination in the starboard aft pocket. While he concluded that this rocking was caused by running over a padeye, he did not see it hit one. It may well be that the rocking, if there was any, was caused by the trailer moving off the raised square on the center of the hold over the inclined brow plate towards the pocket. Moreover, Russell, who had operated the tractor which was used to back the trailer into place, testified that the trailer had not run over a padeye.

Even were that assumed to have happened, the circumstances of this accident rule out the running over of a padeye as its cause. The padeyes were located on the brow plate at the outside of the square and a significant amount of time, probably more than a minute, elapsed between the passing of the trailer wheels over the brow plate and the happening of the accident. The testimony was that the accident occurred when the tractor was about to disengage from the trailer according to libellant or shortly thereafter according to the tractor driver and libellant's witness Folino. Before this could happen, the trailer had to be spotted in the pocket, a process which required on this occasion several maneuvers. In addition, if the libellant's version be accepted, the legs which are the trailer's front support (both sets of wheels are located in the rear third of its length) had to be cranked down from a horizontal position to their position at the time of the accident, virtually vertical, an operation requiring additional time. The tractor driver's version of the facts likewise involved a substantial lapse of time between the passage over the edge of the square and the explosion. He said that the accident did not occur until after he had disengaged and backed away

although he did not agree that any time was consumed in a cranking operation. In either event the explosion was so far removed in time from the alleged contact with the padeye as to rule out contact with the padeye as its cause. It might be argued that the tire was weakened by contact with the padeye and the actual explosion was caused by the combination of this earlier injury to the tire and a sudden shock. The driver testified, however, that the trailer had been moved with the legs in a lowered, i. e. vertical, position, an inch or so off the deck when the tractor was still engaged in such manner as to support the front of the trailer. Upon disengagement, the front of the trailer dropped down that inch or so so that it was resting on the legs. I cannot conceive of this drop as a significant shock even to a weakened tire. Since the trailer is approximately thirty feet long and the front wheels are less than ten feet from the rear end and the front axle is only a few feet from the rear axle, the dropping of the front end of the trailer an inch or even a few inches would drop the part of the trailer above the tire only a fraction of an inch. The shock of this drop would appear to be no more than the normal strain to which the tire had been subjected on the trip from the location of the padeye to its berth in the pocket.

█ Only one explanation of the accident remains, that the proximate cause was a latent defect in the tire. I conclude, on the evidence, that this explanation should be accepted.

█ This finding, of course, rules out negligence as a basis for recovery since such a latent defect could not have been discovered by the most prudent inspection of the Government, its contractor Morace, or any other party. Recovery, if there is any, must, therefore, rest upon liability without fault.

██ Libellant as a marine carpenter, engaged at the time of the accident in an activity clearly "ship's work", is one within the purview of the vessel owner's warranty of seaworthiness.

Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953). The shipowner's liability is unaffected by the fact that the defective instrumentality which made the vessel unseaworthy was brought aboard by another, Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954), or by the fact that, as perhaps the case here, control of the loading of the ship was in the hands of another, Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959).

The question then is whether the presence of the latently defective tire on the facts here constituted unseaworthiness. The traditional position has been that a defect in cargo is not unseaworthiness of the ship. This doctrine has been eroded, however, at least to the point where a defect in the container in which the goods are shipped as opposed to the goods themselves, the cargo proper, will constitute unseaworthiness. Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), Reddick v. McAllister Lighterage Line, 2 Cir., 258 F.2d 297 (1958), cert. den. 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229. See Atlantic & Gulf Stevedores v. Ellerman Lines, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962).

While this Circuit has on at least one occasion, Carabellese v. Naviera Aznar, S.A., 2 Cir., 285 F.2d 355 (1960), cert. den. 365 U.S. 872, 81 S.Ct. 907, 5 L.Ed.2d 862, been chary of extending the unseaworthiness doctrine in the cargo area, its holding and its language, "[w]e need not here determine whether an owner might be absolutely liable for a defect making the cargo so hazardous that it could not be safely loaded," 285 F.2d at 360, is consonant with the drawing of a rational distinction between cargo which, albeit difficult to handle, can be safely handled by one exercising due care, and cargo which, whether because of a defect generic to cargo of its type or one peculiar to the particular load, is apt to produce injury, irrespective of the care exercised. Such a distinction would appear sound and would clearly, on the facts here, result in recovery for the libellant.

Even under the prevailing cargo-container dichotomy, however, I am of the opinion that the defect here is one cognizable under a claim of unseaworthiness.

Uncontradicted testimony characterized the trailer here as a wheeled container, and this characterization appears to be sound. The Government's operation here was of the type referred to often as "piggy-backing". In this operation, goods are loaded aboard a trailer and hauled by tractor to a point where they are placed aboard another form of transportation, which may be, as here, a ship, or, even more commonly, a railroad flatcar. Following this leg of its journey, the trailer is unloaded, hooked up to a tractor and moved on on the next leg. In this process, the trailer is not goods being shipped, but an instrumentality of the shipping process, a mobile package. It is, thus, container and not cargo, and a defect in the trailer's tires, like a defect in a more conventional container, will, on facts such as those presented here, constitute unseaworthiness. While it seems somewhat anomalous to permit recovery where the defective tire was part of a piggy-back trailer while perhaps denying it where the tire was part of a vehicle which was itself the cargo, that should not result in denying the libellant here the recovery he is entitled to under prevailing law. Rather it should suggest a more rational distinction than that between cargo and container, which might support recovery in both situations.

I turn next to the shipowner's claim against the Government for indemnity. Since no negligence exists on any part, there is no issue of active v. passive tortfeasors; there is no active tortfeasor here. The right to indemnity, if one exists, must arise out of some warranty created by the Government's contractual position as space charterer or shipper.

■ I have found no case indicating that a space charterer is liable for injuries due to unseaworthiness. Were that the case, libellant might have a direct right against the Government as well as the shipowner and it would be necessary to determine what right of contribution or indemnity exists between parties so placed. That, however, is not the case. Rather, the shipowner relies upon what it conceives to be the implied warranty of a shipper that the shipment is reasonably fit for carriage.

In support of the existence of such a warranty the shipowner cites Pierce v. Winsor, D.C.D.Mass., and C.C.D.Mass., Fed. Cas. Nos. 11,151, 11,150 (1861). There the carrier was held on the warranty theory to be entitled to indemnity for damage done by a bulk stowage of mastic which melted and inundated the other cargo. If Pierce v. Winsor ever went as far as the shipowner contends, it has been overruled by the Carriage of Goods by Sea Act which lays down a general principle of non-liability of the shipper in the absence of fault when it provides in section 1304(3) of title 46 U.S.Code:

"(3) The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault, or neglect of the shipper, his agents, or his servants."

In opposition the shipowner takes the position that COGSA deals only with goods and has no application where injury to person is involved. I find nothing in COGSA that indicates that its abolition of warranties with respect to the goods is limited to abolishing the warranty where the defect in the goods results in damage to other goods rather than to persons.

■ While COGSA does not deal with the obligations of shipper, carrier or ship to a third person who has suffered personal injuries, the reason is not that COGSA is concerned only with property as opposed to personal injury but that COGSA governs only rights and obligations between shipper and carrier or ship. COGSA does define the rights and obligations inter sese arising out of the carriage of goods relation. Since any shipper's warranty which exists, exists only as an incidental obligation of that relation, it follows that COGSA's abolition of such warranties is equally effective whether the damage resulting from the breach of the asserted warranty was damage to goods or damage to person.

There is some language in the opinion in Luckenbach Steamship Co. v. Coast Mfg. & Sup. Co., D.C.E.D.N.Y., 185 F. Supp. 910 (1960), which might indicate the survival of the general warranty rule in spite of COGSA. At page 919, the opinion says "The only warranties the Court finds implied from the contractual relationship between the shipper and the carrier are (i) an implied warranty of the suitability for shipment of the packages containing the goods, * * *."

To begin with, the judge in the Luckenbach case, on reargument, indicated that his remarks as to the existence of warranties were unnecessary to the issue of jurisdiction which was before the court and should not have been included in the original opinion.

Giving full weight to his statement that there was an implied warranty of suitability for shipment of packages, however, it did not mean that the Government had impliedly warranted the tire that exploded in this case. The injuries caused in the Luckenbach case resulted from the explosion of goods shipped in the packages referred to. Likewise the non-maritime case cited in the Luckenbach opinion as authority for the existence of the implied warranty of the packages, Eastern Motor Express v. A. Maschmeijer, Jr., Inc., 2 Cir., 247 F.2d 826 (1957), cert. den. 355 U.S. 959, 78 S.Ct. 535, 2 L.Ed.2d 534, involved damage done by the goods and not by the package. While, for the purpose of the distinction between cargo and container in the law of seaworthiness, the defective

tire is a container defect, the meaning of "package" in the statement of this warranty is something different. The statement deals with the suitability of the package to contain the goods, not its suitability to contain its own components such as the compressed air in the tire of the trailer here.

■ There is, thus, no theory upon which the shipowner can recover against the Government.

The final issues to be decided concern the amount of the libellant's damages. These may be classed under four heads: wage loss, medical expenses, hearing impairment, and pain and suffering. Libellant's age was 49 at the time of the accident.

■ Libellant's injuries kept him out of work for ten weeks following the accident. During the periods immediately before and after the accident, he was averaging, through his usual work as marine carpenter and periodic assignment as snapper or boss carpenter, about $155 per week. Hence, he is entitled to $1550 for this loss. In addition, libellant testified that he lost from the intermittent recurrence of pain and difficulty from his back injuries fifty-five days throughout the following year. He supported this claim by reference to a calendar kept for that year. While this is not the most intrinsically reliable proof, I am satisfied that he lost that many days as a result of injuries for which the owner is responsible and he should be compensated for the loss of fifty-five days at his base rate of pay as carpenter of $25, or a total of $1375. While libellant also testified that recurrence of pain was a factor in loss of work in subsequent years, together with unrelated illness, the evidence is not sufficient to justify any additional award for past or future wage loss. The total for this item is, therefore $2925 (being $1550 plus $1375).

The reasonable value of libellant's medical expense was stipulated to be $516.55, and libellant is entitled to this figure.

There was a good deal of controversy surrounding libellant's hearing impairment. Respondents elicited from libellant's otologist the fact that libellant may have had some prior hearing loss, and the reports of the two otologists who tested libellant after the accident differ somewhat as to the extent of loss. In addition, there is some question as to whether libellant suffered damage to only one or to both ears. I think it is clear, however, that libellant could hear before the accident both conversational tones and musical tones without the use of a hearing aid, and that, after the accident, he needs a hearing aid for conversational tones and has permanent loss of high tones which cannot be corrected by the use of such an instrument. He should, therefore, be awarded the cost of the hearing aid, which I find to be $350. In addition, he should be compensated for the noncorrectible loss and for the inconvenience and cosmetic disadvantage of the hearing aid by an additional award of $1500. The total for hearing impairing is, then, $1850 (being $1500 plus $350).

While it is as always difficult to fix a figure for pain and suffering, past and future, I find $1500 an appropriate figure.

My conclusion is that libellant should recover $6791.55 (being $2925 plus $516.55 plus $1850 plus $1500) from respondent United States Lines, and that the libel against respondent United States of America and the impleader petitions should be dismissed.

This opinion is intended to embody findings of fact and conclusions of law.

Settle decree on notice.