LEATHER'S BEST INC., Plaintiff,

v.

S.S. MORMACLYNX, her engines, boilers, etc.,

v.

MOORE–McCORMACK LINES INC., Tidewater Terminal, Inc., and Universal Terminal and Stevedoring Corp., Defendants.

No. 69–C–1027.

United States District Court, E. D. New York.

June 5, 1970.

Bigham, Englar, Jones & Houston, New York City, by F. Herbert Prem, New York City, of counsel, for plaintiff.

Browne, Hyde & Dickerson, New York City, by John H. Reilly, Jr., New York City, of counsel, for defendants S.S. Mormaclynx, Moore-McCormack Lines, Inc. and Tidewater Terminal, Inc.

## MEMORANDUM OF DECISION

JUDD, District Judge.

Plaintiff seeks damages for the loss of cargo shipped from Europe to New York in a container. The general admiralty jurisdiction of this court has been invoked. The action was tried to the court. This memorandum includes the required findings of fact and conclusions of law, but the court has also marked plaintiff's proposed findings and conclusions.

The parties are the steamship Mormaclynx, its owner, Moore-McCormack Lines, Inc. and a Moore-McCormack subsidiary, Tidewater Terminal, Inc. which had charge of the pier where the vessel unloaded in Brooklyn, New York. Plaintiff also made the stevedore, Universal Terminal and Stevedoring Corp. a defendant, but consented to a dismissal of its complaint against this defendant during the course of the trial.

The case has been elaborately prepared and briefed as a test of a new bill of lading clause which purports to treat a container as a single package for purposes of statutory limitation of liability. Under the facts of this case, the court holds that the $500 limitation applies to the 99 individual bales shipped in the container and not to the container as a unit.

### Facts

The principal facts in this case are undisputed.

Plaintiff purchased approximately eleven tons of leather from Carl Freudenberg, a German leather manufacturer, in 1967. Freudenberg employees withdrew the leather from their warehouse, packed it in cartons and checked it against the packing slips. It was loaded into 99 cartons of an average size of approximately 46 feet long, 2 feet wide and 1½ feet high. Steel straps were placed around each carton, both for protection and in order to qualify them as bales under the applicable tariffs. Gross, tare and net weights were recorded, and the bales were then put aside to wait for one of defendants' containers. The leather was in flawless condition when packed.

At the request of the Freudenberg firm, a truckman engaged by defendant Moore-McCormack's agent in Germany delivered a container to the Freudenberg plant in Weinheim, Germany, on April 14, 1967. The 99 bales of leather were loaded into the container under the supervision of the truck driver, who gave his receipt for 99 bales of leather, helped close the doors, and watched while the container was sealed. He delivered the container without incident to the defendant ship at Antwerp, Belgium.

The bill of lading was issued by Moore-McCormack's agent, naming plaintiff as the one to whom the Arrival Notice was to be addressed.

After the Mormaclynx docked in New York, the container was unloaded on Saturday, April 25, 1967 by Universal Terminal and Stevedoring Corp., an independent stevedore. Employees of Tidewater Terminal, Inc. then placed the container on a bogie, and hauled it to a storage area on the pier to await plaintiff's arrival.

On Monday, April 27, 1967, plaintiff's truckman came to the pier at 9:30 a. m.

to pick up the container. The container could not be found, and the police were notified. The next day, the empty container was located in Freeport, Long Island, but the goods have not been recovered.

Plaintiff's traffic manager was familiar with ocean tariffs and bills of lading. He received about one container a week from Freudenberg. The freight rate was computed on a unit rate per thousand kilograms, less a discount for the use of the ship's container. The traffic manager testified that all lines in the North Atlantic Westbound Conference charged the same rates. He did not declare any excess valuation in this case, and in fact, never did so.

The leather was insured under a cargo loss policy. Payment of the loss was received on a loan receipt basis, and the present suit is brought by the cargo insurer in the name of the consignee.

Testimony was introduced establishing the New York sound market value of the goods to be $155,192.47. This figure was not challenged by the defendants, except as they claim that the bill of lading limits their liability.

### The Bill of Lading

The bill of lading under the column "Marks & Nos." sets forth the following legends:

"C F W
NEW YORK
MADE IN GERMANY
2202/1–99
Container nr. 209134
UB 9622
HOUSE-TO-HOUSE
Seal Nr. 26844

SHIPPER'S LOAD AND COUNT"

Under the column, "Number and kind of packages: description of goods," the bill of lading states:

"1 container s. t. c.
99 bales of leather"

(s. t. c. is the abbreviation for "said to contain.")

Under the column "Gross weight," it states:

"10864 kos."

Several other provisions of the bill of lading are relevant to the present dispute. On the face of the bill of lading is stamped the following provision, all in capital letters:

"SHIPPER HEREBY AGREES THAT CARRIER'S LIABILITY IS LIMITED TO $500 WITH RESPECT TO THE ENTIRE CONTENTS OF EACH CONTAINER EXCEPT WHEN SHIPPER DECLARES A HIGHER VALUATION AND SHALL HAVE PAID ADDITIONAL FREIGHT ON SUCH DECLARED VALUATION PURSUANT TO APPROPRIATE RULE IN THE CONTINENTAL NORTH ATLANTIC WESTBOUND FREIGHT CONFERENCE TARIFF."

The printed receipt form on the face of the bill of lading states, among other things:

"Weight, measurement, quality, quantity, contents, condition, marks, numbers and value although declared by the Shipper in this Bill of Lading shall be considered as unknown to the Carrier unless expressly recognized and agreed to the contrary. The signing of this Bill of Lading shall not be considered as such an agreement."

Defendants' agents in Rotterdam signed for the Master that:

"We herewith certify that the within mentioned goods have been actually shipped on board the above vessel."

The continuation of the bill of lading on the reverse side, in fine print, set forth, among other things:

"1. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, except that when issued to cover carriage of goods to Canada it shall have effect subject to the provisions of the Canadian Water Carriage of Goods Act, 1936 * * * During any period when neither of said Acts applies

by its own force the carrier, if responsible in any capacity for the goods, shall not be liable for loss or damage arising or resulting * * * from any cause whatsoever not proved due to the negligence of the carrier, which shall also be entitled to all of the rights, immunities, exemptions and limitations stated in this bill of lading. * * * "

"Carrier" is defined in clause 2 of the bill of lading, which states that the term:

" * * * shall include the ship, her owner, operator, demise charterer, time charterer, master and any substituted carrier, whether acting as carrier or bailee, and all persons rendering services in connection with performance of this contract; "

Clause 13 of the bill of lading limited the carrier's liability to $500 "per package" unless a higher valuation was declared and an additional freight charge paid. It parallels the liability and valuation provisions of the Carriage of Goods by Sea Act. 46 U.S.C. § 1304(5). The pertinent language reads:

"13. In case of any loss or damage to or in connection with goods exceeding in actual value $500, lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and the carrier's liability in any capacity, if any, shall be determined on a value of $500 per package or per customary freight unit, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill of lading and extra freight paid if required; "

### Containers

The container in this case was 40 feet long, 8 feet high and 8 feet wide. It was the property of the ship owner. It was first sealed by the Freudenberg firm, in the presence of defendants' agent, and sealed a second time by the German customs officials at the border. It was intended to remain sealed until it was opened for customs inspection in New York.

Containers were developed during World War II in order to reduce pilferage of U. S. Army goods in Europe. They were used to some extent in the Gulf trade beginning in about 1956 and were pioneered by the Sea-Land organization in the Atlantic trade. By 1966, they had become a very important factor in the North Atlantic trade.

The Mormaclynx was constructed in 1964–65 as a seven-hatch general cargo vessel. In the summer of 1966, it was converted for use as a containership, with one hatch enlarged to permit placing the heavier containers below deck, and pedestals and other equipment placed on deck in order to secure containers carried on deck.

Containers are provided primarily for the convenience of the carrier, since they cut down handling time and can save as much as 90% of the time required for unloading and reloading a vessel. Shippers derived some advantage from the use of containers, in that expensive export packaging can be reduced because there is less handling and reloading, and also in that they protect against damage if loaded properly and also against pilferage (unless the whole container is stolen, as took place here). In addition, a 10% discount in freight charges is made in connection with house-to-house delivery of containers.

The shipper pays for the transportation of the container to the export pier and from the import pier, but is not charged anything beyond the specified freight for the use of the container.

### The Loss of the Container

During the trial, the defendants offered evidence concerning the security measures in effect at the pier, in order to counter the inference raised in favor of the plaintiff under the doctrine of *res ipsa loquitur*. It is unnecessary at this time to distinguish between Moore-

McCormack and Tidewater, since they both claim that Tidewater was rendering services in connection with the shipping contract.

The delivery book at the pier was not signed. Therefore, no question of misdelivery is involved, but rather a question of negligent loss of cargo.

Moore-McCormack's terminal area extended for four city blocks and was accessible through four gates. Two of the gates were open 24 hours a day and under the continuous supervision of a gateman. The other two gates were open and guarded from 8:00 a. m. to 4:00 p. m. on work-days and were locked the rest of the time. At least one roving watchman was on duty to see that there were no unauthorized persons on the pier and that no one opened any container. Records were kept of all trucks entering and leaving the pier.

However, the defendants did not explain how a 40-foot container, loaded with 99 bales of leather, weighing over ten tons, could be removed from the pier.

There was no sign that the locks on the unguarded gates were broken. Although Tidewater's chief of security interviewed all the gatemen, none of them testified.

### Statutory Provisions

The pertinent provision of the Carriage of Goods by Sea Act is Section 1304(5), which states:

"(5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier."

The Harter Act, which may be applicable during the period after the Carriage of Goods by Sea Act ceases to apply, states in part (46 U.S.C. § 190):

"§ 190. Stipulations relieving from liability for negligence

"It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect."

### The Contentions of the Parties

Both sides have presented the court with intricate arguments in behalf of their positions. Plaintiff seeks to recover $155,192.47 from defendant Tidewater, while holding defendant Moore-McCormack liable for $49,500 should Tidewater be unable to pay. Both defendants disclaim all liability, but argue that should liability be found, the liability of each defendant is limited to $500.

Plaintiff's claim against Tidewater is predicated on the theory that Tidewater is not covered by the provisions limiting liability in the bill of lading. Tidewater opposes this on the basis of the definition of "carrier" in clause 2 of the bill of lading, maintaining that it was rendering services in connection with the contract.

Plaintiff's claim for $49,500 is based on the theory that the provisions of the Carriage of Goods by Sea Act (COGSA) have been incorporated in the contract by clause 1 of the bill of lading, and that it is entitled to $500 for each package, or bale of leather. Section 3(8) of COGSA

prohibits any clause in a bill of lading that lessens a carrier's liability for loss of goods due to negligence. 46 U.S.C. § 1303(8). Plaintiff asserts that the limitation of liability on the front of the bill of lading to $500 for the entire container is invalid as an attempt to limit the carrier's statutory liability.

Defendant Moore-McCormack contends that COGSA does not apply to this case, because the container had already been unloaded from the ship and the bill of lading excluded the provisions of COGSA after unloading. It also contends that even under COGSA the container should be considered as one package so that the total liability, if any, would be only $500.

The issue of negligence will be discussed first; then the question whether a limitation below $500 per package is permissible under the Harter Act; next, whether a container is itself a package; and finally, the applicability to Tidewater of the valuation limits in the bill of lading.

### The Negligence of the Defendants

■ From the facts described above, it is clear that there was some lapse in defendants' security measures. The most reasonable inference is that the container was taken through the guarded gates while the guards were not watching.

The court finds that the loss was the result of negligence of the defendants.

The decided cases show no legal basis for holding that the defendants were free of negligence. Support for the finding of negligence may be drawn from Judge Hough's decision in Evans v. New York & P.S.S. Co., Ltd., 163 F. 405 (S.D.N.Y. 1906), where the evidence was similar to that produced here. After referring to the presumption of negligence from a bailee's refusal to deliver on demand, the court stated:

"In endeavoring to rebut this presumption, they have shown a system of elaborate watching, and proved that the watchers failed to ascertain that anything was happening during a time when some one stole and carried away more than half a ton of material packed in bags of an average weight of about 70 pounds. From such failure to note so remarkable and difficult an occurrence a jury would be warranted in finding a verdict against them, and I arrive at a similar conclusion."

Judge Anderson in his concurring opinion in David Crystal, Inc. v. Cunard Steam-Ship Co., 339 F.2d 295, 302 (2d Cir. 1964), said that theft could not be relied on to avoid responsibility, if the watchman was looking the other way at the crucial moment.

The defendants cite North American Smelting Co. v. Moller S.S. Co., 204 F.2d 384 (3d Cir. 1953) as analogous to this action. There, several large packages of scrap metal were stolen after they had been discharged on the pier. The consignee had removed a portion of the shipment on Friday, but left the rest of the scrap metal on the pier over the weekend rather than pay overtime to remove it. It was shown that the pier owner took security measures similar to those in use at the Moore-McCormack premises. The issue, however, was not the negligence of the pier owner, but whether the ship was negligent in not providing a special guard. The North American Smelting case does not govern this one.

Nor are these defendants absolved from loss by Claflin v. Meyer, 75 N.Y. 260, 264 (1878), which reversed a verdict against a warehouseman. There was proof in the Claflin case that the goods were stolen from the third floor of a bonded warehouse by burglars who placed a ladder on the roof of an adjoining building, scaled a twenty foot blank brick wall, and made a hole in the roof of the warehouse. The court (Samuel Hand, J.) found no proof that any negligence of the warehouseman had contributed to the success of the burglary, but sent the case back for a new trial so that plaintiff might have an opportunity to prove negligence. Here the

facts are quite different, and support a finding of negligence.

### The Claim of Protection under the Harter Act

■ COGSA is applicable only for "the period from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. § 1301(e). Section 12 of COGSA (46 U.S.C. § 1311) preserves the duties, responsibilities and liabilities of the ship or carrier under the Harter Act (46 U.S.C. § 190–196) "after the time they [the goods] are discharged from the ship." Section 190 of the Harter Act, quoted above, therefore applies during the time between discharge and delivery.

Defendants assert that the Harter Act permits the limitation of liability to $500 per container, since the shipper had an option to declare a higher value and pay an added rate.

■ As a preliminary objection, plaintiff asserts that the Harter Act was not pleaded in the answer. However, the first defense in the answer denied liability "by virtue of the provisions of the aforesaid United States Carriage of Goods by Sea Act and/or the provisions of the said bill of lading and/or applicable provisions of the contract of carriage." This language would permit supporting the limitation provisions of the bill of lading by the Harter Act during the time when COGSA did not apply. Moreover, the Harter Act was specifically mentioned in Point I of defendants' trial memorandum, served four days before the trial began. Plaintiff cannot claim surprise in respect of this defense.

The Harter Act has been applied to continue the liability of a ship during the period when COGSA does not apply. Remington Rand, Inc. v. American Export Lines, Inc., 132 F.Supp. 129, 138 (S.D.N.Y.1955) (holding ship liable for negligently caused fire occurring after goods discharged to a lighter); Federal Ins. Co. v. American Export Lines, Inc., 113 F.Supp. 540 (S.D.N.Y.1953) (holding that one year limitation in COGSA is inapplicable to loss after transfer to a lighter).

Prior to the adoption of COGSA, there was an authoritative dictum that a true limitation agreement was valid—that is, a stipulation that the shipper, on agreeing to a specific limitation of liability, would receive a lower rate as against a higher rate offered for the same service without limitation. The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 496–497, 55 S.Ct. 483, 484–485, 79 L.Ed. 1016 (1935).

The *Ansaldo* dictum does not apply, however, to a limitation which violates COGSA, but which the ship owner seeks to revive during the period after COGSA ceases to apply.

David Crystal, Inc. v. Cunard Steam-Ship Co., *supra*, 339 F.2d 295 is squarely in point. That case related to misdelivery after goods were unloaded. Cunard relied on a clause which limited its liability to £20 per package (a figure below the limit permitted under COGSA) unless an excess value was declared and extra freight paid. (See text of clause in David Crystal, Inc. v. Cunard Steam-Ship Co., 223 F.Supp. 273, 280–281 [S.D.] N.Y.1963]). The bill of lading, printed in the record on appeal, had expressly incorporated the terms and conditions of the Brussels Convention of 1924, which is substantially the same as COGSA, but provided that:

"If any term of this bill of lading be repugnant to said Acts to any extent, such terms shall be void to that extent, but no further."

With respect to the claim made here, that the limitation of liability should be valid after the period covered by COGSA, Judge Kaufman stated (339 F.2d at 298–299):

"It seems to us that once the law declared this clause void it should remain void forever. It would be unfair to permit the void clause to spring to life once the goods reached land, for by then Crystal had justifiably relied on the clause's inapplicability in

making its decision on adequate cargo insurance. Moreover, the limitation provision in the bill of lading does not explicitly cover post-arrival damage. Furthermore, the £20 limitation, when contrasted with COGSA's $500 figure, is such an arbitrarily small sum that it should be void as contrary to public policy. Cf. Isbrandtsen Co. v. United States, 201 F.2d 281 (2d Cir. 1953)."

The lower court in the *David Crystal* case treated the Harter Act as inapplicable after discharge onto a wharf (223 F. Supp. 273, 281–282 [S.D.N.Y.1963]). If COGSA made the limitation clause wholly void, it does not matter whether Moore-McCormack could claim freedom from the Harter Act, however.

▆ When a carrier includes an invalid clause in a bill of lading, it should not properly expect the shipper to interpret the clause as sometimes invalid and sometimes valid. If a carrier seeks the benefit of a different measure of liability before loading or after discharge, fairness requires that it specify that the limitation clause relates only to the periods not covered by COGSA.

Defendants rely on Pannell v. United States Lines Co., 263 F.2d 497 (2d Cir. 1959), where the court held that COGSA applied only as a matter of contract and not *ex proprio vigore* to a yacht that was carried on deck. The *Pannell* case, however, did not involve a shipment where COGSA was intended to apply part of the time and not during other periods of the shipping contract. COGSA did not apply to the shipment at any time, for the statute expressly states that the term "goods" does not include "cargo which by the contract of carriage is stated as being carried on deck and is so carried." 46 U.S.C. § 1301(c).

Judge Kaufman concurred in the *Pannell* opinion, and did not find it necessary to distinguish it in the *David Crystal* opinion.

### A Container as a Single Package

▆▆ By adding a stamp to the face of the bill of lading, that liability is limited to $500 "with respect to the entire contents of each container," the defendants indicated at least that it was doubtful whether the container would have been a single package under COGSA. Under clause 13 of the printed bill of lading, loss was limited to "$500, lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit." The fact that the carrier did not consider this clause adequate to make the container a package is in itself fatal to defendants' case. A bill of lading, as a contract of adhesion, is construed strictly against the carrier. Encyclopedia Britannica, Inc. v. S. S. Hong Kong Producer, 422 F.2d 7, 15 (2d Cir. 1969).

The language of the package provision in COGSA is basically inconsistent with treating a loaded container as a package. It limits liability to $500 per package lawful money of the United States, or in case of goods not shipped *in packages*, "per customary freight unit * * *." 46 U.S.C. § 1304(5) (Emphasis supplied.) The leather was bundled into 99 separate packages for shipment, and the packages were loaded into the container. It is illogical to assert that the container is one of the "packages" in which goods are shipped.

The fact that the container was sealed does not prevent treating the contents as separate packages. A printed portion of the bill of lading disclaims knowledge by the carrier concerning weight, measurement or contents of all shipments—even if not within a sealed container. The bill of lading describes the contents of the container as 99 bales of leather with a gross weight of 10,864 kilos. The freight was computed on the basis of a fixed price per thousand kilograms, as specified in the tariff applicable to "Leather n. o. s., [not otherwise specified], in bales or rolls." Having used the "said to contain" description for computing the freight, the carrier should also apply it to the determination of the number of packages.

Some significance may also be given to the fact that the container was the

property of the carrier, and not part of the materials provided by the shipper to make the goods ready for transportation.

■ The Carriage of Goods by Sea Act represented a compromise between the interests of carriers and shippers. It was intended to increase the liability of carriers, and set a standard below which they could not go. Pan-Am Trade and Credit Corp. v. The Campfire, 156 F.2d 603 (2d Cir. 1946) (holding that pro rata clause could not be used to reduce liability below $500 for loss of part of a package); Encyclopedia Britannica, Inc. v. Hong Kong Producer, *supra*, 422 F.2d at 11–12.

The cases cited by defendants do not support treating a container as a package.

The dissenting opinion of Judge Hays in the *Encyclopedia Britannica* case (422 F.2d at 20) treated a container as a package in circumstances similar to those present in this case, but it does not purport to represent the views of the court.

Standard Electrica S. A. v. Hamburg Sudamerikanische etc., 375 F.2d 943 (2d Cir. 1967) held that pallets prepared by the shipper constituted the packages for purpose of COGSA, rather than the individual cartons which were stacked on the pallets and fastened with metal straps like the straps around the bales of leather in this case. There the shipper's invoice described the pallets as the packages. It stated, "Numbers on the packages: ⅑, Quantity: 9." The dock receipt referred to the "No. of Pkgs." as "9 pallets." The first letter from the consignee after the loss complained that "only 2 packages were discharged" out of "a shipment of 9 packages." 375 F.2d at 946. The court therefore had a solid basis for stating that (p. 946):

"Each pallet had the physical characteristics of a package and was clearly a 'bundle put up for transportation.' Black, Law Dictionary (4th ed. 1951)."

The bales of leather in the container on the S. S. Mormaclynx fall within the description of packages in the *Standard Electrica* case.

The other cases relied on by defendants are cases involving a single large item which either was partially boxed as a unit or constituted a single "customary freight unit." Aluminios Pozuelo, Ltd. v. S. S. Navigator, 407 F.2d 152 (2d Cir. 1968) (a three-ton toggle press bolted to a skid and described in the bill of lading as "one (1) skid machinery"); Reid v. Fargo, 241 U.S. 544, 36 S.Ct. 712, 60 L.Ed. 1156 (1916) (automobile boxed for shipment—prior to COGSA); Mitsubishi International Corp. v. S. S. Palmetto State, 311 F.2d 382 (2d Cir. 1962) (boxed steel roll in wooden case); Petition of Isbrandtsen Company, Inc., 201 F.2d 281 (2d Cir. 1953) (locomotive as "customary freight unit").

The holding in Unit Purveyors, Inc. v. Motor Vessel New Yorker, 250 F.Supp. 102 (S.D.Fla.1965), may support the defendants, insofar as it holds that a refrigerator trailer containing 1,657 cardboard boxes of frozen fish justified a recovery of only $500 under COGSA. The opinion, however, does not discuss the authorities or the interpretation of the statute, and may be based on the "customary freight unit" clause of COGSA, since the findings recite that the transportation was charged at a "flat" basis for each trailer as a single unit (p. 105).

Implications favorable to the plaintiff may be drawn from Serrano v. United States Lines Co., 238 F.Supp. 383 (S.D.N.Y.1965), where a defect in the tires of a trailer which had been placed aboard a ship was held to constitute unseaworthiness. The court reasoned that (238 F.Supp. at 387):

"the trailer is not goods being shipped, but an instrumentality of the shipping process, a mobile package. It is, thus, container and not cargo * * *."

The word package in the quotation above was obviously not used with reference to the definition in COGSA.

Three European cases dealing with the matter refuse to treat a container as a

package. In Societe Navale Caennaise v. Gastin, the French Court of Cassation dealt with the theft of 59 bales from a sealed container. Jurisprudence Francaise, October 12, 1964, p. 18. The bill of lading enumerated the nature, numbers and weight of 275 packages which were in the container. The court refused to apply a limitation of 50,000 Francs per unit to the container, stating that:

"it is not the number of the cases, but the nomenclature of the 275 packages which the itemization of the shipment had established."

The Court of Original Jurisdiction of Casablanca, interpreting the Moroccan Maritime Code, stated in Perregaux v. Lignes Franco-Marocaines that:

"A furniture van is not to be considered a single package for the application of the legal limit of liability of the maritime carrier stipulated in Art. 266 of the Moroccan Maritime Code. It is obviously intended to contain numerous packages or objects." Jurisprudence, May 25, 1957, p. 52.

The Lower Court of Cherbourg, France, in Cunard Steamship Co., Ltd. v. Department of Customs, held that a container was not subject to duty as merchandise because it is "transportation equipment" and as such "is neither merchandise nor packing." Jurisprudence, July 6, 1959, p. 46. The Cunard containers resembled the Moore-McCormack container in that they were the property of the carrier, but differed in that packages from different shippers and intended for different consignees were shipped in a single container.

It is desirable that there be predictability concerning the application of COGSA and of bill of lading terms to particular classes of shipments. Aluminios Pozuelo, Ltd., v. S. S. Navigator, supra, 407 F.2d at 156.

Unfortunately, the cases to date do not furnish any basis for clear predictability. Where uncertainty exists, cargo insurers will charge premiums for risks that should be borne by the vessel, and duplicate insurance will be required, to the detriment of both shippers and carriers.

There have also been frequent references to the fact that the shipper can protect himself by declaring a value higher than that specified in the bill of lading. Pannell v. United States Lines Co., supra, 263 F.2d at 498; Mitsubishi International Corp. v. S. S. Palmetto State, supra, 311 F.2d at 384–385; Aluminios Pozuelo, Ltd. v. S. S. Navigator, supra, 407 F.2d at 155–156. This fact does not justify depriving a shipper of the benefits which were intended to be given by the provisions of COGSA. The shipper should not be required to pay an extra charge for protection that COGSA said the carrier must provide.

Revisions of the Brussels Convention of 1924 which led to COGSA were discussed at the Twelfth Session of the Diplomatic Conference on Maritime Law held in Brussels during February, 1968. Limits of liability were agreed upon, based on the number of packages or units enumerated in bills of lading as packed in a container, pallet or other consolidating transport device, but the protocol has not been submitted to the United States Senate for ratification or to the Congress for any conforming amendment of COGSA. Schmeltzer & Peavy, Prospects and Problems of the Container Revolution, 1 J. Maritime L. and Comm. (1970) 203, 224–225.

Under the facts of this case, the court is convinced that the shipment should be treated as 99 packages and not as a single package.

### The Liability of Tidewater Terminal Inc.

At the time of the loss, the carrier had not completed its contract of carriage. Although the container had been lifted off the ship, the normal time for the consignee to pick it up had not yet arrived. The custody and protection of the goods on the pier was the responsibility of the carrier. Tidewater was only

an instrumentality for performing the carrier's duty and therefore was "rendering services in connection with performance of this contract" as specified in paragraph 2 of the bill of lading. Except during the brief period that Tidewater was in existence, the services would have been rendered by Moore-McCormack itself.

The cases relied on by plaintiff for imposing unlimited liability on Tidewater are distinguishable.

Cabot Corp. v. S. S. Mormacscan, 298 F.Supp. 1171 (S.D.N.Y.1969) involved a suit against a stevedore, which had dropped some steel plates on a generator set which had already been loaded on to the ship. The steel plates and the generator set were carried under separate bills of lading for separate shippers. The court held that the stevedore, even if otherwise covered by the bill of lading exemption, was not rendering services "in connection with the performance of *this* contract," since the services were being rendered in connection with another shipper, not a party to the action.

Herd & Co. v. Krawill Machinery Corp., 359 U.S. 274, 79 S.Ct. 766, 3 L.Ed. 2d 820 (1959), held that a stevedore, which dropped a 19-ton press into the harbor, was not entitled to the limitation of liability which the carrier enjoyed under COGSA. In that case, the bill of lading provisions did not advert to stevedores or agents, but dealt only with the carrier's liability. See 359 U.S. at 302, 79 S.Ct. at 769. The S. S. Mormaclynx bill of lading was not involved in the *Herd* case. The liability of Tidewater is therefore limited, like that of defendants S. S. Mormaclynx and Moore-McCormack Lines, Inc., to $500 per package.

The Clerk is directed to enter judgment for plaintiff against defendants S. S. Mormaclynx, her engines, boilers, etc., Moore-McCormack Lines, Inc. and Tidewater Terminal Inc. in the sum of $49,500, together with interest from April 27, 1967, and the taxable costs of this action.