LEATHER'S BEST, INC., Plaintiff,

v.

TIDEWATER TERMINAL, INC.,
Defendant.

No. 67-C-1027.

United States District Court,
E. D. New York.

July 19, 1972.

Bigham, Englar, Jones & Houston, New York City, by F. Herbert Prem, New York City, of counsel, for plaintiff.

Hyde, Dickerson & Reilly, New York City, by John H. Reilly, Jr., New York City, of counsel, for defendant.

JUDD, District Judge.

### FINDINGS, MEMORANDUM AND ORDER

The cause of action for damages against Tidewater Terminal, Inc. as bailee was tried by this court after remand by the Court of Appeals. 451 F.2d 800 (2d Cir. 1971).

The case arose from the loss of a container of leather imported from Germany on the S.S. "Mormaclynx" of Moore-Mc-Cormack Lines, Inc. and unloaded onto the pier by stevedores. The terminal area at the pier was operated at the time

by Tidewater Terminal, Inc., a wholly owned subsidiary of the shipowner. Tidewater was formed in 1966, after containers came into common use, and was dissolved in 1969 or earlier. The loss occurred between 10:00 a. m. on April 25, 1967 and 9:30 a. m. on April 27, when plaintiff's truckman came to pick up the container.

After the original trial, the court found that the ship, the owner, and Tidewater were all negligent in the custody of the container and were liable for damages of $500 per bale for 99 bales of leather which had been in the container. The Court of Appeals reversed and remanded as to Tidewater on the ground that the proof of negligence against Tidewater was not adequate to sustain the holding. The Court of Appeals held that, since the loss of the container occurred on land, the claim against Tidewater was a state law claim for tortious conduct and was governed by rules different from those applicable to the maritime claim against the vessel and the owner.

The Court of Appeals left open for consideration, if Tidewater was found liable, the further question whether it was entitled to the $500 per package limitation of liability which was set forth in the bill of lading.

### The Facts

After the original trial, this court found the facts substantially as set forth in the Court of Appeals opinion (451 F.2d at 806):

The Mormaclynx arrived in Brooklyn on Saturday, April 25, 1967. The container, sealed and undamaged, was unloaded by stevedores and was placed in a large terminal area operated by Mooremac's wholly owned subsidiary, Tidewater Terminal, Inc. ("Tidewater") to await pick up by the shipper. The area was accessible through four gates. Two were open 24 hours a day, supposedly under the continuous supervision of watchmen. The other two were open only from 8:00 A.M. to 4:00 P.M. on weekdays and were similarly guarded at those times. At least one roving watchman was on duty to see that there were no unauthorized persons on the pier and that no one opened any container. Records were kept of all trucks entering and leaving the terminal area.

On Monday, April 27, the shipper's truckman arrived at 9:30 A.M. to pick up the container. It could not be located, although the delivery book at the pier had not been signed. The fence around the area bore no signs of tampering. Next day the police found the container empty, at Freeport, L.I., some 25 miles away. The goods have not been recovered, and the details of the theft have never been reconstructed.

According to Tidewater procedure, a gateman looks at the gate pass and checks off the number of the container before any truck can leave the terminal.

Review of the record and of the calendar now discloses that April 25, 1967 was in fact a Tuesday, and April 27th was a Thursday, so there was no weekend layover of the container. Moreover, the Delivery and Demurrage Record of Moore-McCormack Lines, Inc. (Universal Exhibit A at the original trial) indicates that the container was not discharged until April 26, 1967.

The shipment was under a bill of lading which limited the liability of the carrier to $500 for each container, but which this court and the Court of Appeals construed to mean $500 for every package in the container by virtue of the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1304 (5) and 1303(8).

The term "carrier" was defined in the bill of lading as follows:

[T]he word "carrier" shall include the ship, her owner, operator, demise charterer, time charterer, master and any substituted carrier, whether acting as carrier or bailee, and all persons rendering services in connection with performance of this contract; . . .

The bill of lading also states in paragraph 9:

All responsibility of the carrier in any capacity shall altogether cease and the goods shall be considered to be delivered, but subject to the carrier's lien, when put into possession of customs or other authorities, or in public dock or in public warehouse.

The proof at the trial after remand was brief and largely documentary.

In answers to interrogatories proposed by the plaintiff after remand, Tidewater stated that the container was last seen about 10:00 a. m. on April 25, that it was not aware of the disappearance of the container until plaintiff's truckman called to take delivery on the morning of April 27, and that its first knowledge of the whereabouts of the container was received in a report from the police of Freeport, Long Island, on April 28. Tidewater further stated that the four terminal gates were attended by eight gatemen whose duty it was to record the entrance and departure of trucks with containers and other cargo, and that it had no record of the departure of plaintiff's container. Only two of the gatemen were still in defendant's employ. A report of an investigation by Tidewater's chief of security, R. C. Jacobsen stated that an all-day search of the terminal failed to locate the container and that law enforcement authorities questioned all persons connected with container movements and terminal operation. The report revealed that the FBI and the Waterfront Commission were not notified of the loss until after 5:00 p. m. on April 27th.

Mr. Jacobsen had testified at the original trial that he went over the gate passes issued for vehicles entering and leaving the pier, that they provided no answer to the disappearance of the container, and that his investigation of how it left the pier was unsuccessful.

There were 12 passes missing from the set of serially numbered gate passes for April 24–27 which were offered in evidence. Defendant Tidewater's answers to interrogatories state that it maintained no book listing the containers. Tidewater's attorney asserts that a truck driver gets his pass, waits his turn and sometimes becomes impatient and leaves without using his pass.

The only relevant missing pass is H 5687, a form for "delivering cargo to trucks." From the times on the preceding and subsequent passes, H 5687 must have been issued about 2:45 p. m. on April 25, 1967, which was between the time when Tidewater says the container was last seen and the time when plaintiff's driver came to pick it up.

Another oddity about the gate pass exhibits is that the pass to the plaintiff's truck driver appears to be pass H 5789, issued to Spruce Trucking at 9:25 on April 27, part of Exhibit 16, and not pass H 5267, which Jacobsen describes as issued to the Spruce driver; No. 5267 should apparently have been issued several days before April 24th.

Tidewater's records are less helpful in solving the mystery than might have been desired.

Tidewater's vice-president testified on deposition with respect to the plaintiff's container that "The only information I have is that it was lost or stolen from 27th Street, Brooklyn." Tidewater's gatemen were not called, but the parties stipulated that if called they "would be unable to add any information with regard to what happened to the container from the time that it was put in the forty-foot lot at 20th Street until it was found in Freeport, Long Island." There was no evidence of any connivance between Tidewater personnel in the putative theft. Tidewater's attorney pointed out that the gatemen were selected from the Waterfront Commission list and therefore that even if the container were stolen with the connivance of employees, Tidewater could not be considered negligent.

### Discussion

The ground for reversal of the judgment against Tidewater was stated by

the Court of Appeals in the following words (451 F.2d at 814):

> In cases of loss due to theft, New York requires the bailee to establish only the *fact of theft* in order to meet the bailor's *prima facie* case. The bailee is not required to go on to show that the theft was not the result of its negligence; rather it is for the bailor to demonstrate negligence on the part of the bailee in the context of loss by theft. See Claflin v. Meyer, 75 N.Y. 260, 264 (1878); Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp., 16 N.Y.2d 344, 358–359, 266 N.Y.S.2d 785, 796–797, 213 N.E.2d 873 (1965); Jay Howard, Inc. v. Rothschild, 16 A.D.2d 628, 226 N.Y.S.2d 769 (1962).

> . . . Substantial evidence suggesting theft having been presented, the shipper failed to come forward with evidence concerning possible negligence of Tidewater in connection with the theft. On the record before us, we find it impossible to sustain the finding of negligence with respect to the claim against Tidewater.

The Court pointed out that a finding of negligence is not a finding of fact and therefore is not protected by the "clearly erroneous" standard of F.R. Civ.P. 52(a), if the trial court has operated under an incorrect conception of the applicable law.

In determining the sufficiency of plaintiff's proof of negligence as supplemented at the hearing after remand, this court deems it appropriate to consider the limited means which the plaintiff has to prove what occurred during the time the container was in Tidewater's sole custody. The Court of Appeals has not expressly forbidden this court to follow that accepted principle. Alliance Assurance Co. v. United States, 252 F.2d 529, 534–536 (2d Cir. 1958).

This court can conceive of only five possible ways that the container disappeared: (1) theft while guards were not actually watching; (2) misdelivery to a trucker who had the missing gate pass; (3) bribery of Tidewater personnel or other connivance with the thieves; (4) removal by barge while watchmen were at a different part of the pier; or (5) airlift at night by a quiet helicopter.

■ 1. The hypothesis of a guard being off duty seems most likely under the circumstances. From ancient times comes the query, *"quis custodiet enim custodies?"* If policemen have been known to sleep when they should be on duty, as was evidenced recently by New York Times pictures of patrol cars parked at night in Fort Greene park, it is easy to believe that watchmen on a lonely pier may have lapsed in their duties. In spite of the stipulation that the guards would all testify that they were on duty and did not know what happened, neither the plaintiff or the court are committed to accept the truth of such hypothetical testimony. As a general rule, the trier of facts is not obliged to believe uncontradicted testimony, especially if it offends common sense. United States v. Manuszak, 234 F.2d 421, 424 (3d Cir. 1956); United States v. Birmingham, 447 F.2d 1313, 1315–1316 (10th Cir. 1971). If all eight guards had testified and all eight were men of unimpeachable veracity, the court would still be convinced that one of them must have been lying.

2. Misdelivery has not been proved, but would fall on the side of negligence, if it occurred.

■ 3. Connivance between Tidewater personnel and thieves assumes a criminal act of persons licensed by the Waterfront Commission. Proof that an employee misappropriated property absolves the bailee of responsibility in New York. Castorina v. Rosen, 290 N.Y. 445, 49 N.E.2d 521 (1943). Although there is evidence sufficient to support a finding of theft, there is no evidence that any Tidewater personnel were confederates of the thieves.

It is true that theft has become so commonplace on the waterfront that the New York courts will not permit revocation of a watchman's license for mere connivance in a small theft. Tennenholz

v. Waterfront Commission, 36 A.D.2d 930, 322 N.Y.S.2d 973 (1st Dept. 1971), aff'd, 30 N.Y.2d 668, 332 N.Y.S.2d 103 (1972). Theft of a 40-foot container, however, is still not a venial offense; since it does not appear that the police or the F.B.I. made any charge against any employee, the court can properly infer that the theft resulted from negligence of Tidewater employees and not from felonious acts or omissions on their part.

4. Removal by barge could hardly have gone unnoticed, and is somewhat inconsistent with the empty container having turned up in Freeport, far from the water.

5. While this court has heard convincing testimony in another recent case that two men on top of a burning building were rescued by a passing helicopter (Van Iderstine v. RGJ Contracting Co. Inc. (66–C–142)), that helicopter was neither quiet nor unobserved. One capable of lifting a 40-ton container without being seen by guards is in the category of science fiction and may be disregarded.

█ Applying the common sense that juries are urged to use in drawing inferences from evidence, the court is convinced, from the testimony at the original trial and the additional proof presented after remand, that the container was stolen from Tidewater's custody during a time when a guard supposed to be on duty was not actually on duty, and that this constituted negligence which is attributable to Tidewater. This determination is consistent with the cases cited by the Court of Appeals and by the defendant Tidewater.

In Claflin v. Meyer, 75 N.Y. 260 (1878), the facts indicated that the theft was burglarious and not the result of negligence. There was an opening created in the warehouse roof, accessible by ladder from an adjoining building where the thieves had hired a room, and the court said (at p. 264) that it did not appear

> whether the thieves got in by stealth and broke *out* through the roof or broke *in* through the roof.

As in the instant case, the plaintiff in *Claflin* was given an opportunity on a new trial to offer further evidence of negligence in relation to the theft. In Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp., 16 N.Y.2d 344, 360, 266 N.Y.S.2d 785, 797, 213 N.E.2d 873, 881 (1965), the court approved the lower court's statement that

> It is self-contradictory for a warehouseman simultaneously to assert due care and total lack of knowledge of what happened, and . . . it would establish an unwise rule to place a bailee in better position to be excused if he knew less about the disappearance of the goods than if he knew more.

The court in that case affirmed a finding of liability in the absence of proof of how the loss occurred. In Jay Howard, Inc. v. Rothschild, 16 A.D.2d 628, 226 N.Y.S.2d 769 (1st Dept. 1962), the court held for the plaintiff and said that there was insufficient proof of theft offered by the bailee.

Tidewater in this case submitted only a skeleton brief on remand, relying on what it considered to be this court's original finding of theft and asserting that nothing was added by the new proof. This court did not make a definite finding of theft after the original trial (Leather's Best Inc. v. S.S. Mormaclynx, 313 F.Supp. 1373, at 1376–1377), but it is satisfied on the basis of the original and additional proof, within the requirement that the parties in a civil trial prove their contentions by only 50%+ of evidence, that Tidewater has shown that the container was stolen and that the plaintiff has shown that the theft resulted from Tidewater's negligence.

*Measure of Damages*

█ With respect to the application of the $500 per bale limitation in the bill

of lading, which this court held applicable to Tidewater, the Court of Appeals stated (451 F.2d at 817):

> Plaintiff attacks his conclusion on a number of grounds, notably this court's decision in Cabot Corp. v. S.S. Mormacscan, 441 F.2d 476 (2d Cir. 1971), cert. denied, [McGrath Corp. v. Cabot Corp.,] 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971). While we find it unnecessary now to decide these questions in light of our remand of the shipper's claim against Tidewater, we do note with interest the apparent New York rule, applicable in the context of bailments, that an agent acting within the scope of its authority is entitled to the benefit of any contractual limits upon the liability of its principal. See e. g., Berger v. 34th Street Garage, Inc., 3 N.Y.2d 701, 171 N.Y.S.2d 824, 148 N.E.2d 883 (1958); Howard v. Finnegans Warehouse Corp., 33 A.D.2d 1090, 307 N.Y.S.2d 1022 (1970).

In the *Cabot* case, an independent stevedore claimed the benefit of a $500 limitation in the carrier's bill of lading, which stated that the limitation applied to "all persons rendering services in connection with performance of this contract." This court (313 F.Supp. at 1383) cited the district court opinion in *Cabot* and distinguished it on a ground that is no longer available. The Court of Appeals in *Cabot* referred to the fact that other bills of lading specifically made their limitations applicable to stevedores and that one which did not mention stevedores lacked the "clarity of language" necessary to extend the limitation. The damage in the *Cabot* case resulted from dropping steel plate into the hold on to a different shipper's turbogenerator while the stevedore was loading the ship. It was therefore a maritime tort.

Since the Court of Appeals here said that the liability of Tidewater depends on New York law, the decision of the New York Court of Appeals in *Berger* is more persuasive. In that case, a $50 per shipment limit on a motor carrier's liability was held available to a garage owner who had stored the truck and contents overnight. The court gave some significance to evidence that the plaintiff there knew and approved of the storage in the particular garage. Here plaintiff's dispatch of its truckmen to the Tidewater terminal indicates that plaintiff also knew and approved of the storage of imports at Tidewater and that Tidewater was, in the language of Judge Dye in *Berger* (3 N.Y.2d at 703–704, 171 N.Y.S.2d at 826, 148 N.E.2d at 884).

> . . . an agent *ad hoc* and, while acting pursuant to his authority, was entitled to "such immunities of the principal as are not personal to the principal" which, in this instance, was the limited liability as fixed in the original shipping documents (Restatement, Agency, § 347; Schoeffer v. United Parcel Service of N.Y., 277 App.Div. 569, 101 N.Y.S.2d 451; Collins & Co. v. Panama R. Co., 5 Cir., 197 F.2d 893, certiorari denied, 344 U.S. 875, 73 S.Ct. 168, 97 L.Ed. 677).

The New York Court of Appeals in *Berger* relied on the Fifth Circuit's decision in Collins & Co. v. Panama R. Co., which had reached a different result concerning stevedores from that which the Second Circuit later reached in *Cabot*.

The Fifth Circuit decision in *Collins* was prior to the Supreme Court's decision in Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), where *Collins* was expressly disapproved as a matter of maritime law. However, as pointed out in this court's original opinion (313 F. Supp. at 1383), the *Herd* case did not involve a bill of lading like Mormacscan's which defined "carrier" as including "all persons rendering services in connection with performance of this contract." The Appellate Division in the First Department, with Mr. Justice Breitel presiding, distinguished the stevedore situation involved in the *Herd* case in Revillon Freres v. Cassell Trucking Co., 24 A.D. 2d 845, 264 N.Y.S.2d 24 (1st Dept. 1965), and held that an agent of a sub-bailee was entitled to the benefit of the limitation in the contract of the principal.

Either on the basis of the facts concerning plaintiff's acceptance of Tidewater as the place where its truckman should pick up goods or on the basis of the definition of carrier in the bill of lading, Tidewater, like the defendant Cassell in the *Revillon* case, is "not a stranger to the bailment but . . . the agent of the sub-bailee in the performance of the bailment, and as such entitled to the benefit of the limitation of liability." (*id.* at 26).

If Tidewater's liability is to be decided under New York law, as directed by the Court of Appeals, Tidewater is entitled to the New York courts' interpretation of the limitation of liability.

This conclusion is reinforced by the fact that Tidewater was merely a temporary subsidiary of the shipowner. No similar relationship between the defendants existed in *Herd* or any of the other cases cited by plaintiff. This court has recently recognized that parent companies are not normally liable for the obligations of subsidiaries. United States v. Swingline, Inc. (71–C–1236). But it would be anomalous to hold that the liability of a corporate enterprise is increased by $100,000 because part of the parent's responsibility in a bill of lading has been delegated to a subsidiary.

The parent-subsidiary relationship also answers the plaintiff's contention that the carrier's responsibility and therefore the limitation of liability terminated when the goods were placed "in public dock or in public warehouses." The Tidewater Terminal was not a public dock or warehouse within the meaning of the bill of lading.

#### Conclusion

Having found that the loss of the leather resulted from Tidewater's negligence and that Tidewater is entitled to the benefit of the limitation of liability in its co-defendants' bill of lading, the court concludes that judgment should be entered in favor of plaintiff against Tidewater in the amount of $49,500, with interest and with costs to the plaintiff.

It is so ordered.